## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

vs.                                              Case No.  3:05-cr-159(S3)-J-32MMH

RONALD ROBERT EVANS, SR.
RONALD ROBERT EVANS, JR.
JEQUITA DUMBAR EVANS
GILBERT IRVIN LABEAUD, III

_____

# REPORT AND RECOMMENDATION[1]

**THIS CAUSE** is before the Court on Defendant Ronald Robert Evans, Jr.'s

Supplemental Motion to Suppress Challenging Scope of the Search, filed on March 22,

2006, which was adopted by Defendant Ronald Robert Evans, Sr., and Defendant Gilbert

Irvin LaBeaud, III.[2] See Supplemental Motion to Suppress (Dkt. No. 365; 385); Defendant

Evans, Sr.'s Motion to Adopt Ronald Evans, Jr.'s Supplemental Motion to Suppress (Dkt.

No. 387), Order (Dkt. No. 391); Defendant LaBeaud's Motion to Adopt Ronald Evans, Jr.'s

Supplemental Motion to Suppress (Dkt. No. 398); Order (Dkt. No. 405); Defendant Evans

_____

[1]    Specific, written objections may be filed in accordance with 28 U.S.C. § 636 and Rule 6.02, Local Rules, United States District Court, Middle District of Florida, within ten (10) days after service of this document.  Failure to file timely objections shall bar the party from a de novo determination by a district judge and from attacking factual findings on appeal.

[2]    Defendant Jequita Dumbar Evans also filed a Motion to Adopt Defendant Ronald Evans, Jr.'s Supplemental Motion to Suppress, but later withdrew the motion.  See Motion to Adopt (Dkt. No. 366); Order (Dkt. No. 381).  In an abundance of caution, the undersigned permitted Defendant Jequita Evans to participate at the suppression hearing but instructed her newly retained counsel that Defendant Jequita Evans would have to file a new motion if she wanted to adopt Defendant Ronald Evans, Jr.'s Supplemental Motion to Suppress.  See Transcript of Evidentiary Hearing (Dkt. No 413; Tr.) at 19-22.  Defendant Jequita Evans has not filed a new motion to adopt, nor has she indicated a desire to do so.  See Dkt. for Case No. 3:05-cr-00159-TJC-MMH. Accordingly, the undersigned will not consider Defendant Jequita Evans to be a party to this motion. The Court will refer to Defendant Evans, Sr., Defendant Evans, Jr., and Defendant LaBeaud collectively as "Defendants."

Jr.'s Supplemental Memorandum in Support of Defendant's Motion to Suppress (Dkt. No. 415; Supplemental Memorandum); Defendant Evans, Sr.'s Memorandum of Law that Major Bowling[3] of the Putnam County Sheriff's Office Was Not Authorized to Execute Search Warrant at Labor Camp (Dkt. 410; Defendant Evans, Sr.'s Memorandum of Law).  The government opposes the Motion to Suppress.  See Government's Opposition to Defendant Evans, Jr.'s Supplemental Motion to Suppress Evidence From Search Warrant No. 3:05-m-0177-HTS (Dkt. No. 371); Government's Supplemental Memorandum Regarding the Plain View Doctrine in Response to Defendant Evans, Jr.'s Supplemental Motion to Suppress (Dkt. No. 414).

The undersigned held an evidentiary hearing on the Supplemental Motion to Suppress on April 12, 2006.  See Tr. at 1.  Counsel and parties were present at the hearing and two witnesses testified:  Major Gary Bowling[4] of the Putnam County Sheriff's Office and Special Agent Ricky Dale Langlois[5] of the Environmental Protection Agency (EPA).  See Tr. at 27, 66.

---

[3]    Defendant Evans, Sr., mistakenly refers to Major Bowling as Major "Bolling."  See Dkt. 410.

[4]    Major Bowling has been employed by the Putnam County Sheriff's Office for 10 years.  Tr. at 27-28.  At the time of the search, he was employed as the assistant chief of the detective division and the commander of the SWAT team.  Id. at 29, 32.  For 3 of his 10 years at the Putnam County Sheriff's Office, Major Bowling served as the joint supervisor of a street crimes unit where he made "hundreds or possibly thousands of drug arrests."  Id.

[5]    Special Agent Langlois is employed as the supervisory special agent in charge of the EPA's Criminal Investigation Division in Jacksonville and has been so employed for approximately seven years.  Tr. at 66.  He has worked for the EPA for approximately 20 years.  Id. at 67.  As an agent with the EPA's Criminal Investigation Division, Agent Langlois obtained training and worked cases involving drug interdiction.  Id. 68-69.

I.      **Background**

In 2005, the EPA was investigating Defendant Evans, Sr., and the Evans Labor Camp (the Camp), which was owned and operated by Defendant Evans, Sr., for possible criminal Clean Water Act (CWA) violations.  See Application and Affidavit for Search Warrant 177, Affidavit for Warrant at ¶ 5 (Dkt. 201).[6]  As part of this investigation, on June 3, 2005, EPA Special Agent James Mowatt sought permission to search both the Camp and Evans, Sr.'s residence for evidence of CWA violations.  Id. at ¶¶ 1-4.  As support for his request, Agent Mowatt alleged that pollutants were being knowingly discharged into a creek he observed running behind the Camp.  See id. at ¶¶ 22, 31.  The issuing judge approved the government's application for a warrant authorizing a search of the Camp and the residence of Defendant Evans, Sr.  See Search Warrant (Dkt. No. 202; Search Warrant 177); Search Warrant (Dkt. No. 204; Search Warrant 178).  At the Camp, the government[7] was authorized to photograph, videotape, trace, diagram, label, and sketch:

> 1.   All potential sources of wastewater drainage or discharge points, including, [floor drains and floor traps] . . . .;
>
> 2.  All above ground and underground plumbing from all buildings, bathhouses, and other structures present at the labor camp.;
>
> 3.  All sewers, manholes, trench systems, and other drainage pipes;
>
> 4.  All sources of wastewater discharge.

---

[6]      The application for search warrant 177 and the affidavit in support of the application were docketed together.  See Application and Affidavit for Search Warrant (Dkt. No.  201; App. and Aff. for Warrant 177).  The affidavit in support of an application for a search warrant will be cited as Aff. for Warrant 177.

[7]      The search warrant was granted to "[a]ny United States Marshal and any Authorized Officer of the United States."  See Search Warrant 177 at 1.

Search Warrant 177 at Attach. B.  Additionally, the warrant authorized the government to seize, test, and retain wastewater samples from the Camp.  Id.  The search was executed on June 3, 2005.  See id. at 2.  During the search, the government conducted dye testing at the Camp and seized what appeared to be crack cocaine.  See id.

## II.    Evidence and Testimony

On June 3, 2005, officers from the Putnam County Sheriff's Office, lead by Major Bowling, assisted in the execution of the search warrant by planning the federal agents' entry into the premises and securing the individuals who were found in the Camp's outbuildings.[8]  Tr. at 32-33.  Once inside the Camp, Agent Langlois examined the exterior of a building, which law enforcement officials designated as building number 9 or the "pump house," that had piping entering into and exiting it from two holding tanks which were located outside of the building.  Id. at 69-71.  Agent Langlois observed that the holding tanks were overflowing and that the land which was located on the back side of the pump house was wet.  Id. at 71.  He further observed a power source going into the pump house.  Id. at 72.  Based on these observations, Agent Langlois decided to enter the pump house to establish whether the effluent that was being discharged into the creek was coming from this location.  Id.  At the instruction of Agent Langlois, a sheriff's deputy cut a padlock located on the door to the pump house to enable the federal agents to enter the structure.  Id. at 34, 72.

---

[8]     Major Bowling testified that Agent Mowatt read the search warrant to the law enforcement officers from the Putnam County Sheriff's Office and that they all understood that the search warrant related to the violation of federal environmental laws.  Tr. at 46- 47.

Agent Langlois' and Major Bowling's testimony somewhat varied with respect to the other's actions once they entered the pump house.  According to Major Bowling, upon entering the building, he and Agent Langlois walked in two separate directions, with Agent Langlois focusing on pumping equipment that was located on the left side of the pump house[9] and Major Bowling focusing "on what was in front of [him]" that "had attracted [his] attention."[10]  Id. at 40, 52.  Major Bowling later testified that, although Agent Langlois was focused on the pumping equipment, he did not necessarily walk to that area of the building.  Id. at 51.  Instead, they were standing together.  See id.

---

[9]    The government and Defendant Evans, Jr., submitted photographic exhibits showing the areas of the pump house described by Major Bowling and Agent Langlois.  See Gov't Exhs. (Dkt. 402); Defense Exhs. (Dkt. 400).  The pump house contained a waist-to-chest high concrete block wall that partially separated the pump area from the rest of the pump house.  See Gov't Exhs. 2-3; Defense Exhs. 3-4; Tr. at 92.  While the pumps were located to the left of the concrete block wall, freezers, the entrance to the pump house, an electric outlet with wiring, and an open black bag were located to the right of the concrete block wall.  See Gov't Exhs. 2-3; Defense Exh. 3; Tr. at 92-93.

[10]    During cross-examination, Defendant Evans, Jr.'s attorney, noting that he may have misunderstood Major Bowling's direct testimony, stated to Major Bowling that, "I thought you said [Agent Langlois] proceeded to the pumping equipment which he was primarily focused on and I began to look for other violations of the law or something to that effect?"  See Tr. at 52.  Major Bowling responded, "[y]es.  When we walked into the room together, [Agent Langlois] focused immediately apparently to me on the pumping equipment.  And I scanned the room and I focused immediately on what was in front of me.  And [Agent Langlois] walked one way and I walked the other way."  Id.

Although Defendant Evans, Jr.'s attorney summarized Major Bowling's testimony to be that, while Agent Langlois proceeded to the pumping equipment, Major Bowling "began to look for other violations of the law," see Tr. at 52, Major Bowling never testified, on direct examination, that, during the execution of the search warrant, he was looking for other violations of the law, see id. at 40.  Instead, on direct examination, Major Bowling acknowledged that he understood the warrant to authorize agents to search for "violations of environmental rules," but that once "[he and Agent Langlois] were in a position dealing with the environmental violations, [they] saw other violations of state and federal law that got [them] here today."  Id. at 47-48.

After entering the pump house, Major Bowling observed an open black bag on top of a freezer located on the opposite side of the concrete wall from the pumping equipment. Id. at 37.  Major Bowling testified that his interest was attracted to this black bag because he observed, with his "naked eyes" and through the use of a flashlight, an unlabeled prescription bottle inside of the bag that contained small items wrapped in aluminum foil. Id. at 37-39.  He went on to explain that, based on his training and experience as a police officer, he believed the items wrapped in aluminum foil to be crack cocaine prepackaged for street sale.  Id. at 37-39.[11]  Upon observing the prescription bottle, Major Bowling notified Agent Langlois, who was "more focused on . . . the pumping mechanism" located within a few feet of Major Bowling's location, that he had observed what he believed to be drugs.  Id. at 40.

Major Bowling testified that he was probably the first to identify the crack cocaine, and that, although he did not believe that Agent Langlois could have seen the crack cocaine before he did, Agent Langlois definitely observed the cocaine either at the same time or after him.  Id. at 52-53.  Major Bowling further testified that he did not need to use his flashlight in order to see inside of the bag, but, instead, used the flashlight to verify what he already knew he observed.  Id. at 59-60.  Additionally, although Major Bowling testified that he took the medicine bottle out of the bag and held it in his hand, he explained that he observed the crack cocaine prior to his taking the bottle out of the bag and that he placed the bottle back in the bag exactly how he had found it.  Id. at 57-58, 61.  Following Major

---

[11]  Major Bowling testified that he was 100 percent confident that the item within the prescription bottle was crack cocaine because crack cocaine was the only item that he had ever seen packaged in this manner.  (Id. at 40, 60).

Bowling's discovery, an evidence technician conducted a presumptive field test for crack cocaine. Id. at 60-61.  Thereafter, the crack cocaine was seized and held in an evidence warehouse maintained by the Putnam County Sheriff's Office. Id. at 40, 115.

Agent Langlois testified that, upon entering the pump house, the first thing he did was look at the piping, because he wanted to shut off the power to determine if the effluent that was going into the creek was coming from the pump house. Id. at 75.  He also testified that, upon entering the building, he first walked over toward an electrical outlet that had wiring plugged into it.  Id. at 74, 99, 105.  He explained that he was interested in the electrical outlet and wiring because (1) he considered these items to be a power source that could be pumping effluent into the creek, and (2) given the amount of water located around the building, he had safety concerns and wanted to cut the power off to the electrical outlet, which he later did.  Id. at 74-75.

Once he was standing in front of the electrical outlet, Agent Langlois was essentially standing over the black bag and noticed an amber-colored vial inside the bag containing what he believed to be prepackaged drugs.  Id. at 75-78.  After making this observation, Agent Langlois summoned Major Bowling, who was located "very close" to him, to the bag and said something to the effect of "[d]oes this look like drugs." Id. at 100-01, 106.  While Agent Langlois believed that he drew Major Bowling's attention to the suspected drugs, he explained that Major Bowling was standing so close to him that it would have been difficult for Major Bowling not to have seen the bag simultaneously with him. Id. at 106-07.  Agent Langlois further testified that, based on his law enforcement experience, he "was pretty confident" that the pill bottle contained illegal drugs. Id. at 78, 118.  After seeing the drugs,

Agent Langlois turned his attention to the plumbing that was located on the left side of the pump house to determine the source of the water.  Id. at 76, 107.  Agent Langlois eventually determined that the electrical outlet and wiring he had observed were not associated with the pumping system in the building.  Id. at 117-18.

Under cross-examination, Agent Langlois acknowledged that the pipes inside the pump house appeared to be a closed circulating system that was leaking.  Id. at 87.  He further conceded that the system functioned as a well, given the presence of aeration tanks, a diaphragm tank, a chlorine tank, and two pumps, but explained that he did not consider that possibility until it was suggested by defense counsel and shown to him while reviewing the government's exhibits at the hearing.  Id. at 88-90.

Defendant Evans Jr.'s attorney also cross-examined Agent Langlois regarding an Investigative Activity Report that Agent Langlois completed on August 11, 2005.  See Dkt. 400, Defense Exh. 7.  In the report, Agent Langlois wrote the following: "Once inside, the [Reporting Agent] found the facilities [sic] chlorination system did not appear to be functioning, in-fact was disconnected.  While tracing the chlorinators power source, a black nylon bag . . . was discovered in very close proximity to an electric junction box."  Id.  Agent Langlois testified that, when he entered the building, the pumps were running and he later cut off power to the pumps by flipping a couple of switches in an electrical box that was located in the front left side of the pump house.  Id. at 93, 105.  Agent Langlois also testified that he traced the chlorinator's power source by looking for wires and flipping off switches to ensure that the pumps were shut down.  Id. at 95.  On redirect examination, Agent Langlois acknowledged that floor drains could have been present anywhere within the

pump house. Id. at 117.  However, he admitted that, at the time that he was standing by the electrical outlet, he was not specifically looking for floor drains.  Id.

### III.      Summary of Argument

The Defendants argue that the examination of the black bag by law enforcement officials was outside the scope of the search warrant and not authorized by any exception to the Fourth Amendment's warrant requirement.  Supplemental Motion to Suppress at 3-4; Tr. at 120.  Although Defendants concede that the federal law enforcement officials were acting within the scope of their authority when they entered the pump house, they argue that their authority to search the pump house terminated once they determined that the chlorination system was disconnected, did not appear to be functioning, and the pump house did not appear to be a wastewater facility but rather was a potable water facility. See Supplemental Motion to Suppress at 4; Tr. at 120-22, 140.  Moreover, Defendants claim that, because the bag was located in an area of the pump house separated from the pumping equipment, and because it is clear from the government's exhibits that the electrical outlet was not the power source for the chlorination unit, Agent Langlois and Major Bowling were not entitled to be anywhere near a position from which they could have observed the contents of the black bag.  Supplemental Memorandum at 4-5, 7; Tr. at 121-22.  Additionally, Defendants argue that the crack cocaine was not plainly visible because an observer has to look into the black bag through an amber vial in order to see the crack cocaine, and Major Bowling used a flashlight to see what was inside of the vial. Supplemental Memorandum at 6; Tr. at 123.

Anticipating the government's arguments, Defendants contend that the government cannot sustain its burden of proving that an exception to the warrant requirement exists in the instant case, given the following discrepancies in Agent Langlois' and Major Bowling's testimony: (1) while Major Bowling testified that, upon entering the building, Agent Langlois moved immediately to the pumping equipment, Agent Langlois testified that he immediately proceeded to the electrical outlet and wiring located near the black bag; (2) although Major Bowling claimed that he was the first individual to find the crack cocaine, Agent Langlois also asserted that he was the one who discovered the crack cocaine; and (3) while Agent Langlois stated in his Investigative Activity Report that, once he was inside of the pump house, he found that the chlorination system did not appear to be functioning and was disconnected, he testified at the suppression hearing that he went to the electrical outlet near the bag before making this determination.  Tr. at 124-25, 141.  Finally, citing the Tenth Circuit's decision in United States v. Medlin, 842 F.2d 1194 (10th Cir. 1988), Defendant Evans, Sr., argues that all of the evidence seized pursuant to the search warrant should be suppressed, because Major Bowling, as a county officer acting under the direction of federal officers, grossly exceeded the scope of the federal search warrant by cutting the padlock on the door to the pump house and discovering and seizing the crack cocaine. Defendant Evans, Sr.'s Memorandum of Law at 1-3; Tr. at 126-28.[12]

---

[12]     Defendant Evans, Jr., also suggested that, if the Court determines that the crack cocaine should be suppressed, the Court should then determine the extent to which the government's subsequent evidence was derived from this "tainted" evidence.  See Supplemental Memorandum at 3-5.  Because the undersigned finds that the Supplemental Motion should be denied, the issue raised by Defendant Evans, Jr., will not be addressed.

The government responds that, under the plain view exception to the Fourth Amendment's warrant requirement, the law enforcement officials lawfully seized the crack cocaine because (1) the black bag was open, with its contents visible; (2) the contents of the amber vial were visible within the vial; and (3) the contents of the amber vial were readily identifiable as illegal drugs that were prepackaged for distribution. Opposition at 3-4; Tr. at 134-35. The government also argues that the law enforcement officers were legally authorized to be where they were when they observed the crack cocaine because the warrant authorized the officers to "photograph, videotape, trace, diagram, label and sketch" the plumbing in the pump house, and the officers could have stood on top of the freezer unit on which the black bag was located in order to perform any of the above tasks. Supplemental Memorandum at 4-5; Tr. at 136-37. It further asserts that Agent Langlois was authorized to examine the electrical outlet and wiring located near the black bag because, upon entering the building, Agent Langlois could not immediately determine whether the wires emanating from the electrical outlet were connected to the pumps, and these items posed potential safety risks. See id. Next, the government contends that, because the warrant authorized a search of floor drains and traps, and Agent Langlois testified that floor drains and traps could have been anywhere in the pump house, the agents were authorized to be anywhere in the pump house. See id.

Relying on Horton v. California, 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990), the government further contends that the plain view doctrine is applicable because the invasion of privacy that occurred, namely, the entry into the pump house, was authorized by the search warrant and no additional invasion of privacy occurred before the

crack cocaine came into plain view because the black bag was not moved but "merely inspected."[13]  Supplemental Memorandum at 6-7.  With respect to the discrepancies in Major Bowling's and Agent Langlois' testimony, the government responds that, both Major Bowling and Agent Langlois testified that they were standing quite close to each other when the crack cocaine was discovered, and, in any event, the discrepancies are understandable because Agent Langlois completed his report a few months after the search was conducted and Major Bowling never completed a report.  Tr. at 137-38.  Finally, in regards to Major Bowling's assistance in the execution of the search warrant, the government argues that Major Bowling was fully authorized, under 18 U.S.C. § 3105, to assist federal authorities in the execution of the search warrant, and Major Bowling would have been acting in dereliction of his duty as a law enforcement officer if he had not notified federal agents regarding the plain view presence of the crack cocaine.  Supplemental Memorandum at 7-8; Tr. at 131-132.

IV.     **Discussion**

     **A.      Whether the Crack Cocaine Was Lawfully Seized Pursuant to the Plain View Doctrine**

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. Amend. IV.  It further provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  Id.  While, the text of the

---

[13]      The government also notes Major Bowling's testimony that he did not need to use his flashlight in order to see the contents of the black bag.  See Supplemental Memorandum at 7.

Fourth Amendment provides no remedy for violations, the courts, in interpreting this amendment, have created a remedy - the exclusionary rule. <u>See United States v. Leon</u>, 468 U.S. 897, 906, 104 S.Ct. 3405, 3412, 82 L.Ed.2d 677 (1984) (explaining that the exclusionary rule is "'a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved.'" (quoting <u>United States v. Calandra</u>, 414 U.S. 338, 348, 94 S.Ct. 613, 620, 38 L.Ed.2d 561 (1974)).   Under the exclusionary rule, evidence obtained in violation of the Fourth Amendment is inadmissible in court. <u>Calandra</u>, 414 U.S. at 347, 94 S.Ct. at 619.

"As a general rule, the applicability of the Fourth Amendment does not focus on the question of whether an area or a place is constitutionally protected, [ ] but rather whether the defendant can claim a 'reasonable expectation of privacy.'" <u>United States v. Berrong</u>, 712 F.2d 1370, 1373 (11th Cir. 1983) (citing <u>Katz v. United States</u>, 389 U.S. 347, 350, 88 S.Ct. 507, 510, 19 L.Ed.2d 576 (1967)).   Thus, in order "to challenge a search, one must manifest a subjective expectation of privacy in the invaded area that 'society is prepared to recognize as reasonable.'" <u>United States v. Cooper</u>, 133 F.3d 1394, 1398 (11th Cir. 1998).[14]  The individual raising the challenge bears the burdens of proof and persuasion

---

[14]   The Court notes that in <u>Rakas v. Illinois</u>, the United States Supreme Court found that there is no theoretically distinct concept of standing when determining whether a defendant should be permitted to challenge a search. <u>See</u> 439 U.S. 128, 133, 139-40, 99 S.Ct. 421, 425, 428-29, 58 L.Ed.2d 387 (1978).  Instead, the question is subsumed in the determination of the merits of the Fourth Amendment claim. <u>See id.</u> at 139-40, 99 S.Ct. at 428-29.  Thus, the issue is "whether the challenged search or seizure violated the Fourth Amendment rights of a criminal defendant who seeks to exclude the evidence obtained during it." <u>Id.</u> at 140, 99 S.Ct. at 429.  The Supreme Court recognized that this "inquiry in turn requires a determination of whether the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to
(continued...)

on this issue. Id.  In the instant case, the government does not contest Defendant Evans, Sr.'s or Defendant Evans, Jr.'s standing to challenge the searches of the Camp.[15]  See generally Government's Response to Standing Claims Made by Defendants Ronald Robert Evans, Jr., Jequita Dumbar Evans, and Gilbert Irvin LaBeaud, III (Dkt. No. 340; Response to Standing).

As the government has conceded that Defendants Evans, Sr., and Evans, Jr., had a legitimate expectation of privacy and that a search and seizure occurred without a search warrant, the burden shifts to the government to establish an applicable exception to the warrant requirement and that the search and seizure was reasonable.  United States v. Bachner, 706 F.2d 1121, 1125-26 (11th Cir. 1983).  Under the plain view exception to the Fourth Amendment warrant requirement, "[i]f an article is in plain view, then neither its observation nor its seizure [ ] involve any invasion of privacy."  Horton, 496 U.S. at 134, 110 S.Ct. at 2306.  Indeed, it is well established that "objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may

---

[14](...continued)
protect."  Id.  The Supreme Court later restated the operative inquiry as: "whether government officials violated any legitimate expectation of privacy held by [the defendant]."  Rawlings v. Kentucky, 448 U.S. 98, 106, 100 S.Ct. 2556, 2562, 65 L.Ed.2d 633 (1980).  Thus, the defendant bears the burden of proving that the search was illegal and that he or she had a legitimate expectation of privacy in the area searched.  See id. at 104-05, 100 S.Ct. at 2561.  Justice Harry Blackmun, in a concurring opinion, recognized that the court may consider whether a defendant had a legitimate expectation of privacy in the area searched separately from the determination of whether the Fourth Amendment was violated.  See id. at 112, 100 S.Ct. at 2565 (Blackmun, J., concurring).

[15]     The government has contested Defendant LaBeaud's standing to challenge the searches of the Camp.  See Response to Standing at 3-4.  Given the undersigned's ultimate finding that the Supplemental Motion to Suppress should be denied and the fact that Defendant LaBeaud has recently entered a guilty plea, the undersigned will not separately address the issue of Defendant LaBeaud's standing.

be introduced into evidence."  Harris v. United States, 390 U.S. 234, 236, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067 (1968); see also United States v. Hromada, 49 F.3d 685, 690 (11th Cir. 1995) (stating that "if an officer has lawfully executed a valid arrest warrant, he is not required to shut his eyes to contraband in plain view in order to accommodate the arrestee's desire to avoid  further charges").  In order to uphold a seizure under the plain view doctrine, the incriminating character of the evidence must be immediately apparent. Horton, 496 U.S. at 136, 110 S.Ct. at 2308.  Accordingly, an officer may seize evidence in plain view without a warrant if (1) the officer is lawfully located in the place from which he views the evidence and (2) the incriminating character of the evidence is immediately apparent.[16]  See id. at 136-37, 110 S.Ct. at 2308.

> **1.     Whether the officers were lawfully located in the place from which they observed the contraband**

In the instant case, Defendants concede that the law enforcement officers were acting within the scope of their authority when they entered the pump house.  See Supplemental Motion to Suppress at 4.  However, they assert that the authority to search ended when agents determined that the pump house was not the source of the illegal discharge and further that the authority to search was limited to the portion of the pump house where the plumbing equipment was located.  Supplemental Motion to Suppress at 4; Tr. at 120-22; Supplemental Memorandum at 4-5, 7.  Additionally, Defendant Evans, Jr., contends that the law enforcement officials' authority to search the pump house terminated

---

[16]     Absent consent or a warrant, an object in plain view may not be seized without probable cause.  Soldal v. Cook County, Ill., 506 U.S. 56, 66, 113 S.Ct. 538, 546, 121 L.Ed.2d 450 (1992).

Case 3:05-cr-00159-TJC-MCR   Document 476   Filed 07/12/06   Page 16 of 26 PageID 1744


once they determined that the pump house appeared to be a potable water facility and not a wastewater facility.  Supplemental Memorandum at 4; Tr. at 120-22.   Accordingly, in order to determine whether the officers were lawfully located in the position from which they observed the contraband, the Court must resolve the following issues: (1) at what point, if any, did the officers' authority to search the pump house terminate; and (2) what areas of the pump house were they authorized to search under the terms of the search warrant.

As noted above, Defendants contend that the officers' authority to search the pump house terminated after Agent Langlois determined that the chlorination system did not appear to be functioning and that the pump house did not appear to be a wastewater facility but rather was a potable water facility.  The record does not support either  conclusion. Agent Langlois stated, in his Investigative Activity Report that, once he was inside the pump house, he determined that the facilities' chlorination system did not appear to be functioning and was disconnected.  See Dkt. 400, Defense Exh. 7.  However, the record is not at all clear as to when Agent Langlois reached this determination or whether it was before or after he observed the crack cocaine.  See id.; Tr. at 74, 99.[17]  Nevertheless, even if Agent Langlois determined that the system was disconnected immediately upon entering the pump house, he was authorized, under the terms of the search warrant, to continue his search of the pump house because the search warrant permitted him to search "[a]ll above

_____

[17]     Although the Investigative Activity Report implies that Agent Langlois immediately determined, upon entering the pump house, that the chlorination system did not appear to be functioning, see Dkt 400, Defense Exh. 7, Agent Langlois' testimony at the hearing suggests that the crack cocaine was discovered before he had reached that conclusion, see Tr. at 92.

ground and underground plumbing from all buildings . . . at the labor camp." <u>See</u> Search Warrant 177 at Attachment B.  Additionally, given Agent Langlois' testimony that, when he entered the pump house, the pumps were running and the system was leaking, <u>see</u> Tr. at 87, 93, it is understandable why Agent Langlois would continue to seek to establish, after entering the pump house, whether the effluent that was being discharged into the creek was coming from this location.

    With respect to Defendants' claim that the officers' authority to search the pump house terminated once Agent Langlois determined that the pump house did not appear to be a wastewater facility, Agent Langlois testified that he did not consider whether the pump house was a potable water facility until defense counsel led him to that conclusion while he viewed the government's exhibits at the hearing.  <u>See</u> Tr. at 88-90.  Moreover, even if Agent Langlois immediately determined that the pump house was a potable water facility, he could have remained in the pump house, nevertheless, to sketch the plumbing in the building, as he was authorized to do under the terms of the search warrant.  <u>See</u> Search Warrant 177 at Attachment B.  Thus, Defendants' claim that the government's authority to search had terminated before the crack cocaine was discovered is without merit.

    Defendants also claim that Agent Langlois and Major Bowling should never have been in a position from which they could have observed the contents of the bag. Supplemental Memorandum at 4-5, 8; Tr. at 121-22.  In support of this assertion, Defendants argue that the bag was located in an area of the pump house separate from the pumping equipment and a review of the government's exhibits demonstrates that the electrical outlet was clearly not the power source for the chlorination unit.  <u>Id.</u>  Agent

Langlois, however, testified that, upon observing the electrical outlet and the wiring emanating from the outlet, he considered the electrical outlet to be a possible power source that was pumping effluent into the creek.  <u>See</u> Tr. at 74-75.   Moreover, contrary to Defendants' assertion, it is not readily apparent, based on a review of the government's exhibits, that the electrical outlet and wiring located to the right of the concrete wall were in no way connected to the pumps located to the left of the concrete wall.  <u>See</u> Gov't Exh. 2.  In fact, Government Exhibit 2 demonstrates that an observer, standing at the entrance of the pump house facing the electrical outlet, would be unable to determine exactly what was connected to the wiring emanating from the electrical outlet.  <u>See</u> <u>id.</u>  The amount of wiring in this location makes such a determination quite difficult as does the positioning of the freezer against the concrete wall which blocks the observer's view of some of the wiring.  <u>See</u> <u>id.</u>  Finally, even if an observer could determine that the electrical outlet and wiring were not in any way associated with the pumps, the law enforcement officers were authorized to be near the location of the black bag, because (1) the search warrant authorized law enforcement officials to search floor drains and traps, <u>see</u> Search Warrant 177 at Attachment B, and (2) Agent Langlois testified that floor drains and traps could have been located anywhere in the pump house, <u>see</u> Tr. at 117.  Accordingly, the undersigned finds that Major Bowling and Agent Langlois were legally authorized, under the terms of the search warrant, to be in the location from which they observed the crack cocaine.  <u>See</u> <u>Harris</u>, 390 U.S. 234 at 236, 88 S.Ct. at 993.

**2.     Whether the incriminating nature of the evidence was readily apparent**

The Court must also consider Evans, Jr.'s contention that the crack cocaine was not plainly visible because an observer has to look through an amber vial in order to see the cocaine. A review of Government Exhibit 5 demonstrates that, regardless of the coloration of the vial, an observer is easily able to perceive the presence of small items wrapped in aluminum foil which Major Bowling and Agent Langlois identified, based on their experience and training, as crack cocaine prepackaged for distribution. See United States v. Arredondo-Hernandez, 574 F.2d 1312, 1314 (5th Cir. 1978)[18] (stating that the plain view doctrine is still applicable even if "[a] policemen may have to crane his neck, or bend over, or squat . . . so long as what he saw would have been visible to any curious passerby"). Accordingly, because an observer can easily perceive the contents of the vial, despite its coloration, the Defendants did not have a reasonable expectation of privacy in the contents of the vial. Cf. United States v. Donnes, 947 F.2d 1430, 1436 (10th Cir. 1991) (holding that a defendant had a reasonable expectation of privacy in the contents of a camera lens case that was closed, made of black leather, and placed inside of a glove). Additionally, although Defendant Evans, Jr., challenges Major Bowling's use of a flashlight to view what was inside of the vial, the use of a flashlight does not transform plain view observations into an illegal search under the Fourth Amendment. See United States v. Dunn, 480 U.S. 294, 305, 107 S.Ct. 1134, 1141, 94 L.Ed.2d 326 (1987). In any event, Major Bowling testified that he did not need to use his flashlight in order to see inside of the black bag. See Tr. at

---

[18]     In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

59-60. In light of the foregoing and the testimony of Major Bowling and Agent Langlois that each readily recognized the contents of the vial to be crack cocaine prepackaged for distribution, the undersigned concludes that the incriminating nature of the evidence was readily apparent to the observing officers.

> **3.** **Whether the government can establish the applicability of the plain view exception given the discrepancies in the evidence before the Court**

Before determining whether the plain view exception applies in this matter, the Court must also address Defendant Evans, Jr.'s suggestion that the government cannot establish that the plain view exception is applicable given the discrepancies that exist between the testimony of Major Bowling and Agent Langlois. See Supplemental Memorandum at 6; Tr. at 123. A review of the record demonstrates that discrepancies are present when the testimony of the two officers is compared. However, the undersigned finds that those discrepancies are mitigated by other portions of Major Bowling's and Agent Langlois' testimony. First, although Major Bowling's testimony that, upon entering the building, Agent Langlois moved toward the pumping equipment, see Tr. at 52, appears to conflict with Agent Langlois' testimony that he immediately proceeded to the electrical outlet and wiring located near the black bag, see id. at 74, 99, Major Bowling later testified that, although Agent Langlois was initially focused on the pumping equipment, he did not necessarily walk to that portion of the building, see id. at 51. This testimony is consistent with Agent Langlois' testimony that the first thing he did, upon entering the building was look at the piping. See id. at 75. Second, although Major Bowling and Agent Langlois both claimed to have been the first law enforcement official to observe the crack cocaine, they both

testified that they were very close to each other when the discovery was made, so close in fact that they both indicated that they may have observed the drugs simultaneously.  See id. at 52-53, 107.  Given the close proximity of Major Bowling and Agent Langlois at the time of the crack cocaine discovery and the possibility that Major Bowling and Agent Langlois viewed the crack cocaine simultaneously, it is not inconceivable that they could have difficulty remembering who alerted the other's attention to the drugs first.  Regardless, the identity of the officer who discovered the crack cocaine has no bearing on whether the crack cocaine was in plain view of law enforcement officers because, as noted above, the officers were authorized to be in this location under the terms of the search warrant.  Therefore, these discrepancies do not compel a finding that the government failed to establish the applicability of the plain view exception.[19]  Accordingly, the undersigned finds that, because Major Bowling and Agent Langlois were lawfully in a position to view the crack cocaine, which was in plain view, and the incriminating nature of the cocaine was readily apparent, their seizure of the crack cocaine was lawful under the Fourth Amendment.

---

[19]    Although Defendants also contend that Agent Langlois' statement in his Investigative Activity Report that, he determined, once he was inside the pump house, that the pump house's chlorination system did not appear to be functioning conflicts with his testimony that, upon entering the pump house, he immediately walked over to electrical outlet near the black bag, see Tr. at 141, the undersigned has already found that, even if Agent Langlois immediately determined, upon entering the pump house, that the chlorination system did not appear to be functioning, he was, nevertheless, authorized to continue his search of the pump house, including the area near the black bag.

**B.    Whether Major Bowling Grossly Exceeded the Scope of the Search Warrant by Cutting the Padlock to the Pump House and Seizing the Crack Cocaine**

Relying on United States v. Medlin, 842 F.2d 1194 (10th Cir. 1988), Defendant

Evans, Sr., also argues that all of the evidence that was seized pursuant to the search

warrant should be suppressed because Major Bowling, as a county officer acting under the

direction of federal officers, "grossly exceeded" the scope of the search warrant by cutting

the padlock on the door to the pump house[20] and discovering and seizing the crack

cocaine.    Defendant Evans, Sr.'s Memorandum of Law at 1-3; Tr. at 126-28.    The

undersigned finds that this argument is without merit.

In regards to who is authorized to serve a search warrant, 18 U.S.C. § 3105

provides that:

> [a] search warrant may in all cases be served by any of the officers
> mentioned in its direction or by an officer authorized by law to serve such
> warrant, but by no other person, except in aid of the officer on his requiring
> it, he being present and acting in its execution.

18 U.S.C. § 3105.  While the Eleventh Circuit has not directly addressed this issue, the

Fifth, Eighth, Ninth, and Tenth Circuits have held that cooperation between federal and

state law enforcement agencies in the execution of a search warrant is not impermissible

per se.  See Medlin, 842 F.2d at 1196; United States v. Wright, 667 F.2d 793, 797 (9th Cir.

1982); United States v. Evans, 572 F.2d 455, 487 (5th Cir. 1978); United States v. Cox, 462

F.2d 1293, 1306 (8th Cir. 1972).  In the instant case, the search warrant was issued to

---

[20]    The record is unclear as to whether Major Bowling was the county law enforcement officer who cut the padlock to the door of the pump house under the direction of Agent Langlois. See Tr. at 34, 72.  The undersigned will assume, for purposes of Defendant Evans, Sr.'s argument, that Major Bowling did, in fact, cut the padlock.

"[a]ny United States Marshal and any Authorized Officer of the United States."  Search

Warrant 177.  Major Bowling testified that EPA Agent Mowatt, an officer of the United

States, called him and asked for the assistance of the Putnam County Sheriff's Office in the

search.  Tr. at 32-33.  Accordingly, because Major Bowling was acting "in aid of" the EPA

agents during the search, his participation in the search, including his cutting of the padlock

to the pump house at the direction of Agent Langlois, see Tr. at 34, 72, was authorized by

18 U.S.C. § 3105, see 18 U.S.C. § 3105.

Acknowledging that Major Bowling may have been authorized to assist in the

execution of the search warrant, Defendant Evans, Sr., contends that all evidence seized

should be suppressed because Major Bowling grossly exceeded the scope of the search

warrant.  See Defendant Evans, Sr.'s Memorandum of Law at 1-2.  In the case cited by

Defendant Evans, Sr., the Tenth Circuit found that the blanket suppression of all evidence

seized during a search was an appropriate remedy.  See Medlin, 842 F.2d at 1200.  In

Medlin, a federal search warrant was executed at a residence by three ATF[21] agents who

were accompanied by a county deputy.  Id. at 1195.  While the ATF agents searched the

residence for evidence of federal firearms offenses, the county deputy searched the

residence for evidence of suspected state offenses.  Id. at 1196.  By the time the search

was completed, ATF agents had seized 130 firearms and the county deputy had seized 667

items of property that were not identified in the warrant.  Id. at 1195-96.  The Tenth Circuit

agreed with the district court's determination that the county deputy had "employed the

---

[21]     The search warrant was issued to agents of the Bureau of Alcohol, Tobacco, and
Firearms (ATF).  See Medlin, 842 F.2d at 1195.

execution of the federal search warrant as a 'fishing expedition.'" Id. at 1199.  After finding that the ATF agents failed to prevent the county deputy's "flagrant disregard" of the terms of the search warrant, the Tenth Circuit affirmed the district court's suppression of all of the evidence seized under the warrant.  Id. at 1200.

The blanket suppression of all evidence seized during a search is an extraordinary remedy that may be imposed only when a search is essentially transformed into an impermissible general search due to the flagrant disregard by law enforcement officials of the terms of the search warrant.  See United States v. Wuagneux, 683 F.2d 1343, 1354 (11th Cir. 1982); United States v. Squillacote, 221 F.3d 542, 556 (4th Cir. 2000); United States v. Le, 173 F.3d 1258, 1269-70 (10th Cir. 1999).  The record in the instant case does not support a determination that Major Bowling flagrantly disregarded the terms of the search warrant or that he utilized the search as an opportunity to find evidence of offenses outside the scope of the search warrant.  As noted in footnote 10 above, although during his cross-examination of Major Bowling, counsel for Defendant Evans, Jr., summarized Major Bowling's testimony to be that, when he and Agent Langlois entered the building, Agent Langlois focused on the pumping equipment while he looked for other violations of the law, see Tr. at 52, Major Bowling never testified, on direct examination, that, during the search he was looking for other violations of the law, see id. at 40.  To the contrary, he testified that he understood the search to be focused on violations of environmental laws.  See Tr. at 47-48.  Moreover, unlike in Medlin, where the county deputy had received a tip that stolen property would be found at the residence, there is no indication that Major

Bowling began the search with an expectation that he would find evidence of violations of anything other than environmental laws.  See Medlin, 842 F.2d at 1195, 1197.

The results of the instant search and the search in Medlin are also markedly different.  In Medlin, 667 items were seized that were not identified in the search warrant, here, only one item was seized that was not covered by the terms of the search warrant. Furthermore, as a county deputy assisting federal officers in the execution of a search warrant, Major Bowling's authority to search was derived from, and as great as, the authority extended to the EPA agents.  See Medlin, 842 F.2d at 1196.  As noted above and assuming that Major Bowling was the individual who discovered the crack cocaine, Major Bowling was fully authorized, under the plain view exception to seize the crack cocaine. See Wright, 667 F.2d at 797 (holding that plain view evidence seized by a state law enforcement official during the execution of a federal warrant was not subject to suppression because a federal officer required the state official to assist in the search). Accordingly, given the finding that Major Bowling did not flagrantly disregard the terms of the search warrant, the undersigned finds that Defendant Evans, Sr.'s, request for a blanket suppression of all of the evidence seized during the June 3, 2005 search should be denied.

## V.     CONCLUSION

In light of the foregoing, the undersigned recommends that the Supplemental Motion to Suppress be denied.

## <u>RECOMMENDATION</u>

Accordingly, it is recommended that:

1.     Ronald Robert Evans, Jr.'s Supplemental Motion to Suppress Challenging Scope of the [June 3, 2005] Search (Dkt. No. 365) be **DENIED**.

2.     The Motion to Suppress Challenging Scope of the [June 3, 2005] Search (Dkt. No. 365) as to Ronald Robert Evans, Sr., and Gilbert Irvin LaBeaud, III, be **DENIED**.

**ENTERED** at Jacksonville, Florida, this 12th day of July, 2006

MARCIA MORALES HOWARD
United States Magistrate Judge

lc3

Copies to:

The Honorable Timothy J. Corrigan
United States District Judge

Counsel of Record