# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

vs.                                          CASE NO.:  3:05-cr-159(S3)-J-32MMH

RONALD ROBERT EVANS, SR.
RONALD ROBERT EVANS, JR.
JEQUITA DUMBAR EVANS
GILBERT IRVIN LABEAUD, III

_____

### REPORT AND RECOMMENDATION[1]

**THIS CAUSE** is before the Court on:  1) Ronald Robert Evans, Sr.'s Motion to

Suppress Evidence Derived from Constitutionally Invalid Search Warrant Identified as the

Warrant Filed Under Case No. 3:05-m-0182 (Second Search of Residence) (Dkt. No. 249;

First Motion to Suppress) filed December 23, 2005; 2) Ronald Robert Evans, Sr.'s Motion

to Suppress Evidence Derived from Constitutionally Invalid Search Warrant Identified as the

Warrant Filed Under Case No. 3:05-m-0177 (First EPA Florida Labor Camp Search) (Dkt.

No. 251; Second Motion to Suppress) filed December 27, 2005; 3) Ronald Robert Evans,

Sr.'s Motion to Suppress Evidence Derived from Constitutionally Invalid Search Warrant

Identified as the Warrant Filed Under Case No. 3:05-m-0199 (Computer Search) (Dkt. No.

258; Third Motion to Suppress) filed December 28, 2005; 4) Ronald Robert Evans, Sr.'s

Motion to Suppress Evidence Derived from Constitutionally Invalid Search Warrant Identified

---

[1]        Specific, written objections may be filed in accordance with 28 U.S.C. § 636 and
Rule 6.02, Local Rules, United States District Court, Middle District of Florida ("Local Rule(s)"),
within ten (10) days after service of this document.  Failure to file timely objections shall bar
the party from a de novo determination by a district judge and from attacking factual findings
on appeal.

as the Warrant Filed Under Case No. 3:05-m-0203 (Second EPA Florida Labor Camp Search) (Dkt. No. 259; Fourth Motion to Suppress) filed December 28, 2005; and 5) Ronald Robert Evans, Sr.'s Motion to Suppress Evidence Derived from Constitutionally Invalid Search Warrant Identified as the Warrant Filed Under Case No. 3:05-m-0178 (First Search of Residence) and Incorporated Memorandum of Law in Support (Dkt. No. 331; Fifth Motion to Suppress) filed February 9, 2006.[2]  Defendant Evans, Jr.[3] has adopted all of the motions to suppress.  See Order (Dkt. No. 370).  Defendant Jequita Evans has adopted the First Motion to Suppress, Third Motion to Suppress, and Fifth Motion to Suppress.  See id. Defendant LaBeaud has adopted the Second Motion to Suppress and Fourth Motion to Suppress.  See id.  The government opposes all of the motions to suppress.  See Government's Motion to Strike and Opposition to Motion to Suppress Evidence From Search Warrant No. 3:05-m-0182-HTS (Dkt. No. 279; Opposition to the First Motion to Suppress) filed January 7, 2006; Government's Motion to Strike and Opposition to Motion to Suppress Evidence From Search Warrant No. 3:05-m-0199-HTS (Dkt. No. 280; Opposition to the

---

[2]     Defendant Evans, Sr. also filed Ronald Robert Evans, Sr.'s Supplemental Memorandum of Law in Support of Motions to Suppress Based on Invalidity of Search Warrants Based on Jurisdictional Defect in Warrants Identified as 3:05-m-177, 178 and 203 (First and Second Labor Camp Search and First Residence Search) and Based on Taint Thereof on Warrants Identified as 3:05-m-182 and 199 (Second Residence Search and Computer Search) (Dkt. No. 329; Supplemental Memorandum) filed February 8, 2006, which was adopted by Defendant Evans, Jr.  See Order (Dkt. No. 370).  The government filed its response February 22, 2006.  See Government's Response to Defendant Evans, Sr.'s Supplemental Suppression Memorandum Re Clean Water Act (Dkt. No. 341; Response to Supplemental Memorandum).

[3]     The undersigned notes that Defendants Gilbert Irvin LaBeaud, III and Ronald Robert Evans, Jr. have entered guilty pleas which would render the motions to suppress moot as to them.  However, as those pleas have not yet been accepted by the district judge, the undersigned, in an abundance of caution, will address their arguments.

Second Motion to Suppress) filed January 7, 2006; Government's Motion to Strike and Opposition to Motion to Suppress Evidence From Search Warrant No. 3:05-m-0177-HTS (Dkt. No. 281; Opposition to the Third Motion to Suppress) filed January 7, 2006; Government's Motion to Strike and Opposition to Motion to Suppress Evidence From Search Warrant No. 3:05-m-0203-HTS (Dkt. No. 282; Opposition to the Fourth Motion to Suppress) filed January 7, 2006; Government's Opposition to Motion to Suppress Evidence from Search Warrant No. 3:05-m-0178-HTS (Dkt. No. 352; Opposition to the Fifth Motion to Suppress) filed March 6, 2006.[4]

On March 15, 2006, the undersigned held a hearing on these motions.  See Notice of Hearing (Dkt. No. 344).  Counsel for Defendant Evans, Sr., Defendant Evans, Jr., Defendant Jequita Evans, and Defendant LaBeaud were present as was John Sciortino, Assistant United States Attorney.  The motions are now ripe for review.

## I.    Background

Defendant Evans, Sr. owns and operates a farm labor contracting business (the Evans Labor Camp) that houses, contracts out, and transports migrant and seasonal farm

---

[4]    By order dated March 2, 2006, the Court denied the motions to strike.  See Dkt. No. 342.

laborers.  See Aff. for Warrant 119 ¶ 73.[5]  These laborers are housed in either Palatka, Florida (the Florida Camp) or North Carolina (the North Carolina Camp), depending on the growing season.  See Aff. for Warrant 182 ¶ 2, 5, 20.  The Evans Labor Camp's office is located in Defendant Evans, Sr.'s home where he resides with his wife, Defendant Jequita Evans (the Residence).  See id. ¶ 30; Aff. for Warrant 119 ¶ 65; Aff. for Warrant 178 ¶ 24; Government's Response to Standing Claims Made by Defendants Ronald Robert Evans, Jr., Jequita Dumbar Evans, and Gilbert Irvin LaBeaud, III (Dkt. No. 340; Response to Standing) at 2.  Defendants Jequita Evans and Evans, Sr. are the parents of Defendant Evans, Jr.  See Response to Standing at 2.  Defendants Evans, Jr., Jequita Evans, and LaBeaud all work for Defendant Evans, Sr. and the Evans Labor Camp.  See id. at 2-3; Aff. for Warrant 182 ¶¶ 6, 19; Aff. for Warrant 119 ¶ 75, 80, 82.

In 2003, the Federal Bureau of Investigation (FBI) began investigating Defendant Evans, Sr. for possible violations of various federal criminal laws relating to the operation of the Evans Labor Camp.  See Aff. for Warrant 119 ¶ 3, 25.  These potential violations included: conspiracy to violate the Thirteenth Amendment's prohibition of slavery and involuntary servitude (18 U.S.C. § 241), collection of credit through extortionate means (18 U.S.C. § 894); peonage (18 U.S.C. § 1581); involuntary servitude (18 U.S.C. § 1584); forced

---

[5]        The applications for search warrants and the affidavits in support of each application were docketed together.  See Application and Affidavit for Search Warrant (Dkt. No. 199; App. and Aff. for Warrant 119); Application and Affidavit for Search Warrant (Dkt. No. 201; App. and Aff. for Warrant 177); Application and Affidavit for Search Warrant (Dkt. No. 203; App. and Aff. for Warrant 178); Application and Affidavit for Search Warrant (Dkt. No. 205; App. and Aff. for Warrant 182); Application and Affidavit for Search Warrant (Dkt. No. 207; App. and Aff. for Warrant 199); Application and Affidavit for Search Warrant (Dkt. No. 211; App. and Aff. for Warrant 203).  Hereinafter, an application for a search warrant will be cited as App. for Warrant ### and the affidavit in support of an application for a search warrant will be cited as Aff. for Warrant ###.

labor (18 U.S.C. § 1589); the manufacture or distribution of a controlled substance (21 U.S.C. § 841); and simple possession of controlled substances (21 U.S.C. § 844). <u>See</u> <u>id.</u> ¶ 3.  During the investigation, FBI Agents interviewed laborers who alleged that crack cocaine, beer, and/or cigarettes were sold by employees of Evans Labor Camp on credit to the laborers.  <u>See</u> <u>id.</u> ¶¶ 13, 30, 39, 50, 52, 55, 57, 62.  In addition, several laborers told agents that when laborers became indebted to the Evans Labor Camp, they were not allowed to leave.  <u>See</u> <u>id.</u> ¶ 23, 27, 30, 48, 53, 64.  Based on this testimony and other information, FBI Special Agent Daniel C. Wescott sought permission to search the Florida Camp.  <u>See</u> App. for Warrant 119.  On April 19, 2004, the magistrate judge on duty, The Honorable Howard T. Snyder, issued Search Warrant 119 which authorized a search of the Florida Camp for evidence of the above listed criminal violations.[6]  <u>See</u> Search Warrant (Dkt. No. 200; Search Warrant 119).  For reasons which remain unknown to this Court, Search Warrant 119 was never executed.  <u>See</u> <u>id.</u> at 2.

In May of 2004, United States Department of Labor, Wage and Hour Division (DOL) agents conducted an investigation at the Florida Camp.  <u>See</u> Aff. for Warrant 182 ¶ 15-16. During the investigation, the agents interviewed several laborers, spoke with Defendant Evans, Sr., and received documents from Defendant Evans, Sr.  <u>See</u> <u>id.</u> ¶¶ 17-19. Apparently as a consequence of this investigation, on May 25, 2005, a federal Grand Jury sitting in Jacksonville returned an indictment against Defendant Evans, Sr. charging him with two counts of violating the criminal false statements statute and three counts of violating the

---

[6]      The Honorable Howard T. Snyder, United States Magistrate Judge issued all of the search warrants in this case prior to his recusal on December 29, 2005.  <u>See</u> Order (Dkt. No. 263).

Migrant and Seasonal Agricultural Worker Protection Act (MSAWPA).  See Indictment (Dkt. No. 1).

Meanwhile, the Environmental Protection Agency (EPA) was also investigating Defendant Evans, Sr. and the Evans Labor Camp for possible criminal violations of the Federal Water Pollution Control Act, commonly known as the Clean Water Act (CWA).  See Aff. for Warrant 177 ¶ 5; Aff. for Warrant 178 ¶ 5.  As part of this investigation, on June 3, 2005, EPA Special Agent James F. Mowatt, III, sought permission to search both the Florida Camp and the Residence for evidence of CWA violations.  See Aff. for Warrant 177 ¶ 3-4, 32; Aff. for Warrant 178 ¶ 3-4, 32.  As support for his request, Agent Mowatt alleged that pollutants were being knowingly discharged into a creek he observed running behind the Florida Camp.  See Aff. for Warrant 177 ¶ 22; Aff. for Warrant 178 ¶ 22.  The magistrate judge approved the government's applications for searches of the Florida Camp and the Residence and issued Search Warrants 177 and 178.  See Search Warrant (Dkt. No. 202; Search Warrant 177); Search Warrant (Dkt. No. 204; Search Warrant 178).  At the Florida Camp, the government was authorized to photograph, videotape, trace, diagram, label, and sketch: "1. [a]ll potential sources of wastewater drainage or discharge points . . .; 2. [a]ll above ground and underground plumbing . . .; 3. [a]ll sewers, manholes, trench systems, and other drainage pipes; 4. [a]ll sources of wastewater discharge." Search Warrant 177, Attach. B.  Additionally, the government could seize, test, and retain wastewater samples from the Florida Camp.  See id.  Further, the issuing magistrate judge authorized the government to seize documents relating to wastewater management from the Residence.  See Search Warrant 178, Attach. D.   When the searches were executed on June 3, 2005, the

government seized several documents from the Residence, conducted dye testing at the Florida Camp, and seized what appeared to be crack cocaine from the Florida Camp.  <u>See</u> Search Warrant 177at 2; Search Warrant 178 at 2.

The next day, June 4, 2005, the government presented the magistrate judge with another application to search the Residence.  <u>See</u> App. for Warrant 182.  This time the government asked permission to search for evidence of:  conspiracy to violate the Thirteenth Amendment's prohibition of slavery and involuntary servitude (18 U.S.C. § 241), collection of credit through extortionate means (18 U.S.C. § 894); peonage (18 U.S.C. § 1581); criminal false statements (18 U.S.C. § 1001); involuntary servitude (18 U.S.C. § 1584); forced labor (18 U.S.C. § 1589); the manufacture or distribution of a controlled substance (21 U.S.C. § 841); simple possession of controlled substances (21 U.S.C. § 844); and criminal violations of the MSAWPA (29 U.S.C. §§ 1812, 1841, 1851).  <u>See</u> Aff. for Warrant 182 ¶ 4.  As support for the request for this search warrant, DOL Special Agent Rebecca S. Hall attached her sworn affidavit and incorporated Agent Wescott's affidavit which had been filed in support of the application for the search warrant in Case No. 3:04-m-0119.  <u>See</u> Aff. for Warrant 182 ¶ 3.  Agent Hall's affidavit also relied, in part, on witness interviews and information obtained during the execution of the search warrants in Case Nos. 3:05-m-0177-HTS and 3:05-m-0178-HTS on June 3, 2005, <u>see</u> id. at ¶¶ 31-48.  Based upon this application, the magistrate judge granted the government permission to search the Residence and seize documents reflecting entries of debts and interest charged to laborers and other documents related to laborer earnings and personnel records.  <u>See</u> Search Warrant (Dkt. No. 206; Search Warrant 182), Attach. B.  This warrant was executed on June 4, 2005, and the government seized

numerous documents related to the Evans Labor Camp laborers and its employment operations, as well as guns and un-taxed cigarettes.  See Search Warrant 182 at 2.

During the execution of Search Warrant 182, the government asserts that agents developed reason to believe that much of the business record evidence was generated from, and could be found in, a computer located at the Residence.  See Aff. for Warrant 199 ¶ 6-9. Accordingly, the agents seized the computer without a warrant, see id. ¶ 9, and later sought and obtained a warrant to search that computer.  See App. for Warrant 199; Search Warrant (Dkt. No. 208; Search Warrant 199).

Finally, on June 13, 2005, the government again approached the magistrate judge for authorization to conduct a more extensive search of the Florida Camp for potential CWA violations.  See App. for Warrant 203.  The magistrate judge granted the government permission to enter the Florida Camp and excavate a white PVC pipe observed by the agents, take pictures, and conduct more tests on the water.  See Search Warrant (Dkt. No. 212; Search Warrant 203), Attach. B.  This warrant was executed on June 14, 2005.  See Search Warrant 203 at 2.

Thereafter, on July 14, 2005, a First Superseding Indictment was returned against Defendant Evans, Sr. charging him with additional violations of law including a charge of illegal pollutant discharge.  See Superseding Indictment (Dkt. No. 25; First Superseding Indictment).  Then, on October 13, 2005, a grand jury returned a Second Superseding Indictment against Defendant Evans, Sr. and also named Defendants Ronald Robert Evans, Jr., Jequita Dumbar Evans, Emma Mae Johnson, Nathaniel Davenport, Eddie Lee Williams, Irvin Sutton, Eugene Sheppard, and Gilbert Irvin LaBeaud as co-defendants.  See Indictment

(Dkt. No. 45; Second Superseding Indictment).  In addition to the previous charges against Defendant Evans, Sr., the Second Superseding Indictment charged all of the named Defendants, except Defendant LaBeaud, with conspiracy to distribute cocaine base and also added individual charges against many of the new defendants.  See id.  Most recently, a Third Superseding Indictment was returned in this case on January 12, 2006.  See Indictment (Dkt. No. 294; Third Superseding Indictment).  This last indictment charges Defendants Evans, Sr. and Jequita Evans with fifty counts of illegal structuring of financial transactions and added one count of witness tampering against Defendant Evans, Sr.  See id.

Defendants[7] are now challenging the validity of each search conducted in the case at bar.  However, before the Court can determine the issues raised by the various motions to suppress, it must first address whether Defendant Evans, Jr., Defendant Jequita Evans, and Defendant LaBeaud have the necessary standing to join Defendant Evans, Sr. in challenging the searches.[8]

---

[7]     Hereinafter the Court will collectively refer to Defendant Evans, Sr., Defendant Evans, Jr., Defendant Jequita Evans, and Defendant LaBeaud as "Defendants."

[8]     Although the Court allowed these defendants to adopt the motions to suppress filed by Evans, Sr., it withheld ruling on whether each defendant had the necessary standing to challenge the searches.  See Order (Dkt. No. 370).

II.     **Standing**[9]

In order to assert a violation of the Fourth Amendment, a defendant must establish that he or she had a legitimate expectation of privacy in the place that was searched.  See Rakas v. Illinois, 439 U.S. 128, 148-49 (1978); United States v. Brazel, 102 F.3d 1120, 1147-48 (11th Cir. 1997).  The reason for such a requirement is that "'Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted.'"  Rakas, 439 U.S. at 133-34 (quoting Alderman v. United States, 394 U.S. 165, 174 (1969)); see also Minnesota v. Carter, 525 U.S. 83, 88 (1998); United States v. Padilla, 508 U.S. 77, 81 (1993) (per curiam) (finding that "[i]t has long been the rule that a defendant can urge the suppression of evidence obtained in violation of the Fourth Amendment only if that defendant demonstrates that his Fourth Amendment rights were violated by the challenged search or seizure" (emphasis in original)).

---

[9]     While the issue has been phrased as one of standing, the Court notes that in Rakas v. Illinois, the United States Supreme Court found that there is no theoretically distinct concept of standing when determining whether a defendant should be permitted to challenge a search.  See 439 U.S. 128, 133, 139-40 (1978).  Instead, the question is subsumed in the determination of the merits of the Fourth Amendment claim.  See id. at 139-40.  Thus, the issue is "whether the challenged search or seizure violated the Fourth Amendment rights of a criminal defendant who seeks to exclude the evidence obtained during it."  Id. at 140.  The Supreme Court recognized that this "inquiry in turn requires a determination of whether the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect."  Id.  The Supreme Court later restated the operative inquiry as: "whether government officials violated any legitimate expectation of privacy held by [the defendant]."  Rawlings v. Kentucky, 448 U.S. 98, 106 (1980).  Thus, a defendant bears the burden of proving that the search was illegal and that he or she had a legitimate expectation of privacy in the area searched.  See id. at 105.  Justice Harry Blackmun, in a concurring opinion, recognized that the court may consider whether a defendant had a legitimate expectation of privacy in the area searched separately from the determination of whether the Fourth Amendment was violated.  See id. at 112 (Blackmun, J., concurring).

A defendant's legitimate expectation of privacy exists when a he or she can show a subjective expectation of privacy that "'society is prepared to recognize as "reasonable."'" United States v. Ford, 34 F.3d 992, 995 (11th Cir. 1994) (quoting Katz v. United States, 389 U.S. 347, 361, 88 S.Ct. 507, 516 (1967) (Harlan, J., concurring)); see also United States v. Robinson, 62 F.3d 1328, 1328 (11th Cir. 1995).   Thus, the determination of whether an individual has a legitimate expectation of privacy in a certain property requires a careful analysis of the facts of the particular case.  See Rakas, 439 U.S. at 142-48; see also United States v. Briones-Garza, 680 F.2d 417, 421 (5th Cir. 1982).   Demonstrating a legitimate expectation of privacy may require more than a mere legitimate presence on the premises or "a subjective expectation of not being discovered."  Rakas, 439 U.S. at 143 & n.12; see also id. at 148.  Similarly, property ownership or residence will not automatically establish a legitimate expectation of privacy in a premises, but are factors to be considered.  See United States v. Salvucci, 448 U.S. 83, 91 (1980); Briones-Garza, 680 F.2d at 421; see also Shamaeizadeh v. Cunigan, 338 F.3d 535, 544 (6th Cir. 2003); United States v. Ramos, 12 F.3d 1019, 1023 (11th Cir. 1994); United States v. Dyar, 574 F.2d 1385, 1390 (5th Cir. 1978)[10] (opining that "[p]roperty rights in absence of reasonable expectations of privacy in property cannot support a Fourth Amendment claim").

The Eleventh Circuit has recognized a number of factors that are relevant to the determination of whether a defendant has a legitimate expectation of privacy in a premises. See United States v. Brown, 743 F.2d 1505, 1507 (11th Cir. 1984) (per curiam); United

_____

[10]       This case and all Fifth Circuit cases decided prior to September 30, 1981, are binding precedent pursuant to Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

States v. Haydel, 649 F.2d 1152, 1154-55 (5th Cir. Unit A July 1981), modified, in part, on other grounds, 664 F.2d 84, 85 (5th Cir. Unit A Dec. 1981).  For example, the right to exclude others is one important factor.  See Brown 743 F.2d at 1507.  Other factors to be considered when determining whether a defendant can assert a Fourth Amendment challenge include: (1) "whether the defendant has a possessory interest in the thing seized or the place searched"; (2) "whether [the defendant] has exhibited a subjective expectation that [the property] would remain free from governmental invasion"; (3) "whether [the defendant] took normal precautions to maintain his [or her] privacy"; and (4) whether [the defendant] was legitimately on the premises."  See Haydel, 649 F.2d at 1154-55.  See also Shamaeizadeh, 338 F.3d at 544-45; United States v. Greer, 939 F.2d 1076, 1094 (5th Cir. 1991).

### A.    The Properties Searched

The properties searched included the Florida Labor Camp, the Residence and a computer located in the Residence.  The Florida Labor Camp is located in East Palatka, Florida and is described as "a farm labor camp consisting of multiple one-story buildings . . . . [with] a chain link and barbed wire fence on at least two sides, including the side containing the main entrance gate."  Search Warrant 203, Attach. A.  While the Court is not aware of the exact dimensions of the Florida Camp, it is located in a rural area, and from the aerial photographs, it appears to be a spacious and heavily wooded piece of land.  See id., Attach. A at 2.  Attached to the gate and next to the Florida Camp's main entrance, is a sign which reads: "'Warning No Trespassing; For all those who do not live on these premises, if caught on the premises, you will be prosecuted unless you have authorization by the owner of the property.'"  Id.

The Florida Camp houses somewhere between 47-85 laborers at a time. <u>See</u> Aff. for Warrant 182 ¶ 20. The main building on the property contains laborers' quarters and common areas, such as a kitchen, dining hall, and men's and women's bathrooms. <u>See</u> Aff. for Warrant 192 ¶ 86. A few other small buildings located on the property are used for additional laborer quarters, and there is a utility shed as well. <u>See</u> <u>id.</u>

The Residence is likewise located in East Palatka, Florida, approximately one and a half miles from the Florida Camp. <u>See</u> Aff. for Warrant 119 ¶ 65. It is described as a one-story brick building with a brick iron fence surrounding it. <u>See</u> Search Warrant 182, Attach. A. Both Defendant Evans, Sr. and Defendant Jequita Evans reside there. <u>See</u> Response to Standing at 6. In addition, the computer which was seized by the government was located on a computer desk in "a home office area in the garage attached to the [R]esidence." Aff. for Warrant 199 ¶ 5.

### B.   Analysis

### 1.   Defendant Evans, Sr.

The government does not challenge the right of Defendant Evans, Sr. to contest any of the searches. Accordingly, the Court will conclude that Defendant Evans, Sr. has the sufficient requisite expectation of privacy to permit him to raise the challenges contained in the motions.

### 2.   Defendant Evans, Jr.

Defendant Evans, Jr. has adopted all five of the motions to suppress. <u>See</u> Order (Dkt. No. 370). The government does not contest Defendant Evans, Jr.'s standing to challenge the searches of the Florida Camp (Search Warrant 177 - Second Motion to Suppress and

Search Warrant 203 - Fourth Motion to Suppress). <u>See</u> Response to Standing at 6. Accordingly, the Court finds that Defendant Evans, Jr. will be permitted to challenge those searches.

However, the government does contest Defendant Evans, Jr.'s standing to challenge the searches of the Residence (Search Warrant 182 - First Motion to Suppress and Search Warrant 178 - Fifth Motion to Suppress) and the computer (Search Warrant 199 - Third Motion to Suppress). <u>See id.</u> Defendant Evans, Jr. asserts that he has standing to challenge those searches because he generated the records seized from the Residence, he listed the Residence as his address on documents he submitted to a federal agency, and the Residence is owned by his father. <u>See</u> Memorandum in Support of Defendant Ronald Robert Evans, Jr.'s Standing to Suppress (Dkt. No. 328; Defendant Evans, Jr.'s Memorandum) ¶ 17. In response, the government argues that Defendant Evans, Jr. did not reside at the Residence and it was not his regular place of business. <u>See</u> Response to Standing at 6.

The Court will consider the factors listed above in determining whether Defendant Evans, Jr. had a legitimate expectation of privacy in the Residence and/or the computer such that he may challenge the searches at issue. Evidence supporting a subjective expectation of privacy on the part of Defendant Evans, Jr. in the Residence or computer is scant. Defendant Evans, Jr. suggests that the Court can "infer from the circumstances of how the records were kept and what the records were that there was an expectation of privacy." Tr. at 53-54. However, no evidence has been presented to the Court regarding how any records belonging to or created by Defendant Evans, Jr. were kept. Further, there is no evidence

-14-

regarding which, if any, of the records found at the Residence were generated by Defendant Evans, Jr. or the contents of those records that would allow a conclusion that Defendant Evans, Jr. had a subjective expectation of privacy in them.  However, Defendant Evans, Jr. seems to assert that records he generated and that were kept at the Residence and on the computer were private, and thus, the Court will assume arguendo that Defendant Evans, Jr. had a subjective expectation of privacy in the Residence and the computer.  Regardless, as stated supra, the Fourth Amendment only protects an expectation of privacy that society is willing to recognize as reasonable.  As demonstrated by the following analysis, Defendant Evans, Jr. has failed to meet his burden of establishing that any subjective expectation of privacy he may have had was reasonable.

Preliminarily, the Court notes that no evidence was presented to support a finding that Defendant Evans, Jr. resided at the Residence or that he had the right to exclude others from either the residence or the computer.  In fact, there is no evidence that Defendant Evans, Jr. himself even had a key to the Residence or a password to the computer. Furthermore, and most surprisingly, Defendant Evans, Jr. presented no evidence that he ever stayed at the residence, used the office, or used the computer.  C.f. Haydel, 649 F.2d at 1155 (finding it "reasonable to assume" that the defendant had authority to exclude others from his parents' home where he had a key, kept clothing there, occasionally remained overnight there, and conducted a portion of his gambling activities there).

The evidence before the Court with regard to the Residence is that only Defendant Evans, Sr. and Defendant Jequita Evans reside there.  See Response to Standing at 2; Affidavit for Warrant 119 ¶¶ 65, 66, 67, 68.  And the only evidence which could support

Defendant Evans, Jr.'s claim that he resided at the Residence is the fact that he gave the Residence as his address to federal authorities. <u>See</u> Defendant Evans, Jr.'s Memorandum ¶ 17; Aff. for Warrant 119 ¶ 75. However, notwithstanding the fact that Defendant Evans, Jr. apparently listed the Residence as his own in documents submitted to a federal agency, the government contends, without objection from Defendant Evans, Jr., that he actually lived someplace else. <u>See</u> Response to Standing at 2; Tr. at 55; Affidavit for Warrant 119 ¶ 68. Based upon the record evidence, the Court is unable to conclude that Defendant Evans, Jr. resided at the Residence or that he had the right to exclude others from the Residence. Moreover, the Court finds that Defendant Evans, Jr. produced no evidence regarding his use or control of the computer.

Next, the Court considers whether Defendant Evans, Jr. had a possessory interest over the place searched or items seized. As previously noted, only Defendant Evans, Sr. and Defendant Jequita Evans appear to have lived in the Residence. The review of public records conducted by agents as part of their investigation established that Defendant Evans, Sr. is the only record owner of the Residence. <u>See</u> Aff. for Warrant 119 ¶ 65. In addition, although Defendant Evans, Jr. apparently contends that he has a possessory interest in the records seized from the Residence because he generated them as an employee of the Evans Labor Camp,[11] <u>see</u> Defendant Evans, Jr.'s Memorandum ¶ 17, he has not shown that

---

[11]    The Court also notes that not all of the seized documents were generated by Defendant Evans, Jr. Indeed, it appears that only a notebook used to document each laborers debt was used by Defendant Evans, Jr. <u>See</u> Defendant Evans, Jr.'s Memorandum at ¶ 4. However, this same notebook was also used by other employees to document similar transactions. <u>See</u> Aff. for Warrant 182 ¶¶ 9, 14, 40, 42. Thus, it is not clear that Defendant Evans, Jr. even generated the documents contained in the notebook. Regardless, the Court will continue the analysis as though Defendant Evans, Jr. did generate the documents seized.

merely because he generated the records he had a possessory interest in them once they were taken to the Residence and/or entered into the computer.  Moreover, even if Defendant Evans, Jr. retained a possessory interest in the records, he has not shown that by virtue of this possessory interest in the records he thereby has a privacy interest in the Residence or computer.  Indeed, the Supreme Court has "decline[d] to use possession of a seized good as a substitute for a factual finding that the owner of the good had a legitimate expectation of privacy in the area searched."  United States v. Salvucci, 448 U.S. 83, 92 (1980).  In recognition of this principle, in United States v. Harrison, the Court of Appeals for the District of Columbia Circuit refused to find that a defendant had established a legitimate expectation of privacy in an apartment that he did not own, and was not a guest in, merely because he stored his drugs there.  See 103 F.3d 986, 989 (D.C. Cir. 1997).  Similarly, this Court cannot find that Defendant Evans, Jr. had a legitimate expectation of privacy in the Residence, a place where he does not live (and has not shown that he was a guest in), merely because he may have chosen to store records there.

Defendant Evans, Jr. also asserts that the records were kept at the Residence and on the computer for safekeeping, thus, he took normal precautions to maintain privacy.  See Tr. at 50.  However, again there is no evidence of what precautions, if any, Defendant Evans, Jr. took once the records were taken to the Residence or entered into the computer.  In fact, it appears that many of the records were in plain view in a home over which Defendant Evans, Jr. had no custody, control, or right to exclude others.  See Aff. for Warrant 182 ¶ 48.  Further, there is no evidence that the computer was password protected, that the office space was usually locked, or that the records were stored in a manner suggesting that they

were to be kept private.  Thus, the Court cannot conclude, based on the evidence before it, that Defendant Evans, Jr. took normal precautions to protect any subjective expectation of privacy he may have had.

Defendant Evans, Jr. next contends that the searches of the office were an extension of the searches of the Florida Camp, and if the Evans Labor Camp office was located on-site at the Florida Camp, he would have had standing to challenge the searches of the office.  See Tr. at 50-53.  Accordingly, he asserts that his standing to challenge the office searches should not be affected merely because the office was located at the Residence and not at the Florida Camp.  See id.  However, he has failed to direct the Court to any authority that supports his position.  Indeed, the cases relied upon by Defendant Evans, Jr., Mancusi v. DeForte, 392 U.S. 364 (1968), United States v. Baron-Mantilla, 743 F.2d 868 (11th Cir. 1984) (per curiam), and United States v. Chaves, 169 F.3d 687 (11th Cir. 1999), see Defendant Evans, Jr.'s Memorandum ¶¶ 10, 13, 14, are readily distinguishable from the case at bar.

In Mancusi, the Supreme Court opined that "[i]t has long been settled that one has standing to object to a search of his office, as well as his home." 392 U.S. at 369.  In that case, the Supreme Court found that the defendant had a reasonable expectation of privacy in the office that he shared with several other union officials.  See id. at 368-69.  The Mancusi court stated that the defendant who "spent 'a considerable amount of time' in the office" and who was in possession of the papers at the time they were seized "could reasonably have expected that only those persons [with whom he shared the office] and their personal or business guests would enter the office, and that records would not be touched

except with their permission . . . ." Id. However, unlike the defendant in Mancusi, there is no evidence before the Court that Defendant Evans, Jr.'s work activities included working in the office at the Residence. See Defendant Evans, Jr.'s Memorandum ¶¶ 1-19. Indeed, it appears that Defendant Jequita Evans actually took care of the administrative tasks while Defendant Evans, Jr. worked at the camps themselves. See Response to Standing at 2; Aff. for Warrant 182 ¶¶ 6, 19; Aff. for Warrant 119 ¶¶ 80, 61, 43. Further, it is not clear that Defendant Evans, Jr. has ever even been to the office or used the computer. In addition, there is no evidence before the Court concerning who had access to the office or the computer in order to permit the Court to determine whether Defendant Evans, Jr. reasonably could have expected any records maintained there to remain private. Thus, Mancusi simply does not provide a basis for this Court to find that Defendant Evans, Jr. had a legitimate expectation of privacy in the Residence or the computer.

In the second case cited by Defendants, Baron-Mantilla, the Eleventh Circuit concluded that a defendant who claimed to live in the searched premises with a mistress, and who possessed a key to the premises, failed to carry his burden of demonstrating a legitimate expectation of privacy in the area searched. 743 F.2d at 870. In affirming the denial of the defendant's motion to suppress, the court noted that the government had proven that the defendant did not own the premises and did not rent the premises. The court acknowledged that the defendant could have established "a legitimate expectation of privacy by demonstrating 'an unrestricted right of occupancy or custody and control of the premise as distinguished from occasional presence on the premises as a mere guest or invitee.'" Id. (quoting United States v. Bachner, 706 F.2d 1121, 1126 n.6 (11th Cir. 1983)). However, the

defendant failed to do so, and the court concluded that the mere fact that he had possession of a key was insufficient to establish a legitimate expectation of privacy in the premises. Id. (citing Rackley, 724 F.2d at 1468).

The court reached the opposite conclusion in Chaves, but nevertheless that opinion still does not support a finding in favor of Defendant Evans, Jr. See 169 F.2d at 690-91. In Chaves, the defendant established a legitimate expectation of privacy over the contents of a warehouse which he neither owned nor formally rented because he had the only key, had "custody and control" of the warehouse, and kept personal and business papers there. See id. In the matter before the Court, Defendant Evans, Jr. has not shown that he has any key to the Residence, much less the only key; nor has he shown any custody or control over the Residence or computer. Further, although he contends that records he generated were kept at the residence, unlike the defendant in Chaves, it is not clear that he placed those records or any other personal belonging there. Accordingly, the undersigned is not persuaded that these cases support a finding that Defendant Evans, Jr. had a legitimate expectation of privacy in the Residence or the computer.

Lastly, the Court notes that Defendant Evans, Jr. was given an opportunity to present evidence to the undersigned regarding his standing to challenge the searches of the residence and computer. See Tr. at 46, 53. However, he chose not to present additional evidence. See id. at 53-54. As the Defendant bears the burden of demonstrating a legitimate expectation of privacy in the area searched, and based on the sparse evidence before the Court, the undersigned concludes that Defendant Evans, Jr. has failed to carry that burden. Accordingly, the undersigned will recommend that the First Motion to Suppress,

Third Motion to Suppress and Fifth Motion to Suppress be denied as to Defendant Evans, Jr.

### 3.    Defendant Jequita Evans

Defendant Jequita Evans is seeking to challenge only the searches of the Residence and computer (Search Warrant 182 - First Motion to Suppress, Search Warrant 199 - Third Motion to Suppress and Search Warrant 178 - Fifth Motion to Suppress).[12]  See Tr. at 57. The government does not contest her standing to challenge these searches.  See Response to Standing at 6.  Accordingly, the Court concludes that Defendant Jequita Evans has a legitimate expectation of privacy in the Residence and computer, and may therefore challenge the government's conduct with regard to the Residence and computer searches.

### 4.    Defendant LaBeaud

Defendant LaBeaud seeks to challenge the searches of the Florida Camp (Search Warrant 177 - Second Motion to Suppress and Search Warrant 203 - Fourth Motion to Suppress).  See Tr. at 57-58.  In support of his right to contest these searches, Defendant LaBeaud contends that because he lived, worked, and received mail at the Florida Camp, he had an expectation of privacy in all of its buildings and surrounding curtilage.  See id. at 59.  He further argues that his expectation of privacy was akin to that which a person would have over the curtilage of his or her home.  See id. at 59-62.  On the other hand, the

_____

[12]     Initially, Defendant Jequita Evans sought to challenge all five of the government's searches.  See Co-Defendant Jequita D. Evans Motion to Adpot [sic] Ronald Robert Evans Sr. Motions to Suppress (Dkt. No. 339; Defendant Jequita Evans' Motion to Adopt).  However, at the March 15th hearing, she withdrew her request to adopt the motions to suppress challenging the Florida Camp searches.  See Tr. at 57.  Based on this representation, the undersigned denied Defendant Jequita Evans' Motion to Adopt to the extent it sought to adopt the motions challenging the searches of the Florida Camp.  See Order (Dkt. No. 370).

government asserts that Defendant LaBeaud can not challenge the Florida Camp searches because he was merely living in one room, shared the rest of the space with other laborers, and therefore, did not have a legitimate expectation of privacy over the entire camp property. See Response to Standing at 4.

Preliminarily, the Court notes that while Defendant LaBeaud, along with others, lived at the Florida Camp, it was apparently being used by Defendant Evans, Sr. and the Evans Labor Camp as a commercial property and not as a traditional residence.  See Aff. for Warrant 119 ¶¶ 15-16, 20, 73, 85; Affidavit for Warrant 182 ¶ 5.  "'Property used for commercial purposes is treated differently for Fourth Amendment purposes than residential property.'" Chaves, 169 F.3d at 691 (quoting Minnesota v. Carter, 525 U.S. 83, 90 (1998)). In fact, the "'expectation of privacy in commercial premises . . . is . . . less than, a similar expectation in an individual's home.'" Id. (quoting New York v. Burger, 482 U.S. 691, 700 (1987)).  Of course, this lower expectation of privacy does not preclude a person from establishing a legitimate expectation of privacy in a commercial space.  See id.

Here, Defendant LaBeaud lived in a rented room at the Florida Camp.  See Motion to Adopt Robert Evans Motions to Suppress (Dkt. No. 332; Defendant LaBeaud's Memorandum) at 1.  Accordingly, it would appear that he did have a legitimate expectation of privacy in his room.  See Chaves 169 F.3d at 690-91.[13]  However, because the status of the entire camp is that of a commercial property, his expectation of privacy beyond that room

_____

[13]      Although the Court has stated that Defendant LaBeaud had a legitimate expectation of privacy in his room, it does not appear that his room was searched, or that even if it was searched, any items were seized from it during either of the Florida Camp searches. See Search Warrant (Dkt No. 202) at 2; Search Warrant (Dkt. No. 212) at 2; Response to Standing at 3. Thus, the finding with regard to Defendant LaBeaud's room does not satisfy the question of whether he may challenge the searches of the Florida Camp.

cannot be compared to the expectation of privacy a person would have over the curtilage of his home.

Even if the Florida Camp was not considered to be a commercial property, it would be more analogous to an apartment complex than an individual residence.  In United States v. Miravalles, the Eleventh Circuit found that tenants in a large high-rise apartment building did not have a reasonable expectation of privacy in the common areas of that building where the lock on the front door to the building was generally undependable and inoperable on the day of the search.  See 280 F.3d 1328, 1333 (11th Cir. 2002).  The court concluded that on that day the "hallways and other common areas . . . were open and accessible not only to all the many tenants and their visitors, to the landlord and all its employees, to workers of various types, and to delivery people of all kinds, but also to the public at large."  See id. at 1333.

Similarly, in this case, it appears that the searches took place in the common areas of the Florida Camp and not in the individual laborer or employee residence quarters.  See Search Warrant 177 at 2; Search Warrant 203 at 2.  Indeed, both of the Florida Camp searches were directed at finding CWA violations, and were limited to:  searching for potential sources of wastewater drainage or discharge, plumbing, and drainage pipes; taking wastewater samples; and excavating and tracing the sources of a white PVC pipe on the Florida Camp property.  See Search Warrant 177, Attach. B; Search Warrant 203, Attach B. Defendant LaBeaud has presented no evidence suggesting that the entrance gate to the Florida Camp was locked on the days of the searches.  While the Court recognizes that there was a "No Trespassing" sign on the outside gate of the Florida Camp, see Search

-23-

Warrant 203, Attach. A, this alone is insufficient to establish a reasonable expectation of privacy in the Florida Camp as a whole.  Indeed, "where one knows in advance that others have access to a room or building, the other individuals are the 'functional equivalent of the public.'"  United States v. Pitt, 717 F.2d 1334, 1337 (11th Cir. 1983).  Here, Defendant LaBeaud was well aware that the Florida Camp was home to somewhere between 47-85 laborers, was open to the other employees, and was subject to inspection by agents from the DOL.  See Aff. for Warrant 182 ¶¶ 16, 20, 23; Affidavit for Warrant 119 ¶ 85.  In addition, it appears that a majority of the laborers who stayed at the labor camps were transients who did not remain at the labor camps long.  See Aff. for Warrant 119  ¶¶ 25, 31, 42, 48, 49, 53, 55, 56, 60; Aff. for Warrant 182 ¶ 28.  Defendant LeBeaud does not appear to have had control over who was permitted on the Florida Camp property or any ability to exclude others from the property.  Thus, Defendant LaBeaud has failed to establish that he had a legitimate expectation of privacy in all of the buildings or areas of the Florida Camp merely because he lived in one of the rooms.  C.f. Fixel v. Wainwright, 492 F.2d 480, 483-84 (5th Cir. 1974) (holding that tenants in a four-unit apartment had an expectation of privacy in their fenced backyard where it was "not as public or shared as the corridors, yards or other common areas of a large apartment complex . . .").

While the Court finds that Defendant LaBeaud does not have a legitimate expectation of privacy in the Florida Camp as a whole merely because of his status as a resident, a person may also have a legitimate expectation of privacy in his work place.  See Mancusi, 392 U.S. at 369.  Defendant LaBeaud worked for the Evans Labor Camp as one of the people who drove the laborers to and from the Florida Camp and the North Carolina Camp

and to and from the camps and the fields of others who sometimes hired the laborers. <u>See</u> Aff. for Warrant 119 ¶¶ 77, 82, 83.  However, to this end, Defendant LaBeaud has failed to produce any evidence tending to show that he had a legitimate expectation of privacy over the entire camp, or even a specific office or work area. <u>See</u> Tr. at 59-62.  Indeed, Defendant LaBeaud presented no evidence of the areas where he worked or what control he had over those areas. <u>See</u> <u>id.</u>  Thus, the Court must conclude that Defendant LaBeaud failed to establish a legitimate expectation of privacy in the entire Florida Camp property merely because of his status as an employee.

The Court has considered the factors identified by the Eleventh Circuit as being relevant to a determination of whether an individual can make a Fourth Amendment challenge, and based upon the record evidence, concludes that Defendant LaBeaud did not have a legitimate expectation of privacy in the Florida Camp at the time of the search. Although the Court specifically alerted Defendant LaBeaud to the factors it would consider when evaluating whether he had a legitimate expectation of privacy in the places searched, and its concerns about the lack of evidence presented to satisfy these factors, i.e. "who was [on the property], what ability [Defendant] LaBeaud would have to exclude others, what precautions to safeguard his privacy were taken, who else would have had access or the ability to observe the areas which were searched," Tr. at 61-62, Defendant LaBeaud chose not to offer any additional evidence and to merely rely on the record, <u>see</u> <u>id.</u> at 62.  Thus, Defendant LaBeaud failed to show that he could exclude others from the Florida Camp, had a possessory interest in the items seized or the place searched, exhibited a subjective expectation that the entire Florida Camp would remain free from governmental invasion, or

took normal precautions to maintain his privacy.  Based on the foregoing discussion, the Court finds that Defendant LaBeaud has failed to establish that he has standing to challenge the searches of the Florida Camp, and the undersigned will recommend that the Second Motion to Suppress and the Fourth Motion to Suppress be denied as to this Defendant.

In light of the foregoing, the undersigned will recommend that Defendant Evans, Jr. be permitted to challenge the searches of the Florida Camp (Second Motion to Suppress and Fourth Motion to Suppress), but that the Court deny the First Motion to Suppress, Third Motion to Suppress and Fifth Motion to Suppress as to Defendant Evans, Jr.  With regard to Defendant Jequita Evans, the undersigned will recommend that she be permitted to challenge the searches of the Residence and the computer (First Motion to Suppress, Third Motion to Suppress and Fifth Motion to Suppress).  Finally, the undersigned will recommend that the Second Motion to Suppress and Fourth Motion to Suppress be denied as to Defendant LaBeaud.

**III.    Standard of Review**

The Fourth Amendment protects an individual's right to be free from unreasonable searches and seizures and mandates that "no Warrants shall issue, but upon probable cause." U.S.Const. Amend. IV.  In evaluating whether there is probable cause, the issuing judge makes "'a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and the "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Jiminez, 224 F.3d 1243, 1248 (11th Cir. 2000) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).  "'[P]robable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts[.]'" United States v. Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999) (per curiam) (alterations in original) (quoting Gates, 462 U.S. at 232).  Moreover, "[p]robable cause does not require overwhelmingly convincing evidence, but only 'reasonably trustworthy information.'" United States v. Angulo-Hurtado, 165 F.Supp.2d 1363, 1376 (N.D. Ga. 2001) (quoting Ortega v. Christian, 85 F.3d 1521, 1524 (11th Cir. 1996)).  Yet, an affidavit will be found deficient if it contains merely conclusory allegations and fails to provide sufficient information in order for the judge to conclude "that evidence or contraband will probably be found at the premises to be searched."  United States v. Martin, 297 F.3d 1308, 1314 (11th Cir. 2002) (internal quotation marks omitted).

The issuing judge's determination of probable cause is entitled to great deference. See United States v. Clay, 355 F.3d 1281, 1284 (11th Cir. 2004) (per curiam); United States v. Nixon, 918 F.2d 895, 900 (11th Cir. 1990); see also United States v. Chapman, 196

F.Supp.2d 1279, 1284 (M.D.Ga. 2002) (recognizing that "'[a] magistrate's decision that probable cause exists is conclusive absent arbitrariness.'" (quoting <u>United States v. Betancourt</u>, 734 F.2d 750, 754 (11th Cir. 1984))).  Thus, the "reviewing court's inquiry is limited to whether the issuing judge 'had a substantial basis for . . . concluding that probable cause existed.'" <u>Angulo-Hurtado</u>, 165 F.Supp.2d at 1375-76 (quoting <u>Gates</u>, 462 U.S. at 238-39); <u>see also</u> <u>Nixon</u>, 918 F.2d at 900.

## IV.   Motions to Suppress

The Court will now turn to the substantive challenges raised in the motions to suppress. In the case at bar, the Defendants[14] have raised several challenges to the search warrants.  First, with regard to Search Warrants 177 (First EPA Labor Camp Search), 178 (First Search of Residence), and 203 (Second EPA Labor Camp Search), those predicated on alleged violations of the CWA (EPA searches), the Defendants have alleged that the magistrate judge who issued the search warrants lacked jurisdiction to do so.  <u>See</u> Ronald Robert Evans, Sr.'s Memorandum of Law in Support of Motion to Suppress Based on Invalidity of Search Warrant Identified as 3:05-m-0177 (First EPA Florida Labor Camp Search) (Dkt. No. 254; Memorandum in Support of the Second Motion to Suppress) at 4; Fifth Motion to Suppress at 4; Ronald Robert Evans, Sr.'s Memorandum of Law in Support of Motion to Suppress Based on Invalidity of Search Warrant Identified as 3:05-m-0203 (Second EPA Florida Labor Camp Search) (Dkt. No. 256; Memorandum in Support of the Fourth Motion to Suppress) at 4; and <u>see</u> <u>generally</u> Supplemental Memorandum.  Second,

---

[14]     The Court recognizes that it found Defendant LaBeaud did not have standing to challenge any of the searches.  <u>See</u> <u>supra</u> Part II(B).  However, the Court will nonetheless address any arguments he made with regard to the Florida Camp searches.

the Defendants request an evidentiary hearing pursuant to <u>Franks v. Delaware</u>, 438 U.S. 154

(1978), in order to challenge the veracity of certain statements made by Agent Mowatt in the

affidavit in support of the applications for Search Warrants 177, 178, and 203 as well as the

agent's failure to include specific information in those affidavits.  <u>See</u> Memorandum in

Support of the Second Motion to Suppress at 4; Memorandum in Support of the Fourth

Motion to Suppress at 3-4; Fifth Motion to Suppress at 4; Supplemental Memorandum at 4;

Tr. at 149-50, 161-62.  This request also relates to the Defendants' claim that the Court

lacked jurisdiction to issue the subject warrants.

The Evans'[15] also challenge the second search of the Residence and the search of

the computer.  With regard to Search Warrant 182 (Second Search of Residence), the

Evans' contend that evidence seized pursuant to this warrant should be suppressed because

the application for the search warrant lacked probable cause and was based on stale

evidence.  <u>See</u> Ronald Robert Evans, Sr.'s Memorandum of Law in Support of Motion to

Suppress Based on Invalidity of Search Warrant Identified as 3:05-m-0182 (Second Search

of Residence) (Dkt. No. 250; Memorandum in Support of the First Motion to Suppress) at 12.

Similarly, the Evans' assert that the search warrant authorizing the search of the computer

was improperly issued as the government's application did not present sufficient facts to

support a finding that there was probable cause to believe evidence of a crime was stored

in the computer.  <u>See</u> Ronald Robert Evans, Sr.'s Memorandum of Law in Support of Motion

---

[15]     Although the Court has found only Defendant Evans, Sr. and Defendant Jequita Evans have standing to contest the searches of the Residence and the computer, in an abundance of caution, the undersigned will consider any argument Defendant Evans, Jr. may have made concerning those searches.  Accordingly, the Court will collectively refer to Defendant Evans, Sr., Defendant Jequita Evans, and Defendant Evans, Jr. as "the Evans'."

to Suppress Based on Invalidity of Search Warrant Identified as 3:05-m-0199 (Computer Search) (Dkt. No. 255; Memorandum in Support of the Third Motion to Suppress).   Lastly, all of the Defendants contend that the application in support of Search Warrant 178 failed to establish probable cause to believe evidence of a federal offense would be present in the places to be searched.  <u>See</u> Fifth Motion to Suppress at 2.  The undersigned will consider the arguments challenging the jurisdiction of the Court first and then address the arguments regarding the propriety of the probable cause determinations.

### A.   EPA Searches

With regard to the EPA searches, Defendants first assert that the warrants authorizing those searches are void for lack of jurisdiction, and therefore, all evidence obtained pursuant to those warrants should be suppressed.  <u>See</u> Supplemental Memorandum at 3, 5.  Related to this argument is their suggestion that any evidence obtained pursuant to the Second EPA Labor Camp Search (Search Warrant 203) and the other two searches, the second search of the Residence (Search Warrant 182) and the computer search (Search Warrant 199), should also be suppressed because of the derivative taint from the First and/or Second EPA searches.  <u>See</u> <u>id.</u> at 4-5.

### 1.   Scope of Review

The Defendants contend that the EPA searches are void because the Court lacked jurisdiction to issue the search warrants.  <u>See</u> Supplemental Memorandum at 3.  They suggest that the undersigned must conduct an evidentiary hearing to independently determine whether CWA jurisdiction extends to this case.  <u>See</u> Tr. at 68-69. They assert that the Court should proceed in this manner because: 1)  the issuing judge did not consider

jurisdiction at all before authorizing the EPA searches; and 2) even if the issuing judge considered jurisdiction, the question of jurisdiction is fundamental.  See id. at 75-76, 84-86. The Court notes that Defendants have not cited any relevant authority for the proposition that this Court should conduct an evidentiary hearing and make a de novo determination regarding the jurisdiction of the issuing court based upon the evidence presented at that hearing.

In opposing Defendants' request, the government argues that necessarily subsumed in the issuing judge's finding that there was probable cause to believe a violation of a federal law had occurred was a finding that this Court had jurisdiction over such an offense.  See Tr. at 111, 115-116.  Accordingly, the government contends that an evidentiary hearing is inappropriate and that the Court should review the question of jurisdiction based upon the affidavits submitted and with "great deference" to the issuing judge's determination.  See id.

Upon review of the relevant authority, the Court concurs with the government and finds that it must limit its review to the facts alleged in the affidavits and must determine the existence of CWA jurisdiction based on those facts.   In United States v. Miller, the government was given permission to search a defendant's business for evidence of a violation of the federal arson statute.  See 24 F.3d 1357, 1359 (11th Cir. 1994).  In order for a particular instance of arson to violate the federal arson statute, the damaged building must have been used in interstate or foreign commerce.  See id. at 1361 n.1.  At the trial level, the district court granted the defendant's motion to suppress evidence resulting from the search based on a finding that "because a sufficient factual basis was not asserted to establish that the property destroyed in the arson was involved in an activity affecting interstate commerce,

the affidavit supporting the search warrant failed to state probable cause of a federal crime." Id. at 1358.  On appeal, the circuit court noted that "[w]hether the search warrant affidavit . . . offers sufficient facts to establish probable cause of a federal crime is a question of law . . . ." Id. at 1360.  In deciding whether the affidavit established probable cause of a federal crime, the Miller court looked to the legislative history of the statute and prior decisions construing the statute as encompassing "any property involved in commercial activity."  See id. at 1360-61.  The Miller court then reviewed the affidavit submitted in support of the warrant.  See id. at 1361-62.  Based upon a review of the affidavit alone, the court concluded that it offered "an orderly, logical progression from initially establishing commercial activity to ultimately asserting probable cause under section 844(i) and that, as a matter of law, it [was] factually sufficient to establish probable cause of a federal crime."  Id. at 1362; c.f. United States v. Brouillette, 478 F.2d 1171, 1176 (5th Cir. 1973) (finding the search warrant deficient because it failed to demonstrate the underlying facts necessary to satisfy the "jurisdictional prerequisite" for the federal offense).  Relying upon the analysis by the court in Miller, the undersigned concludes that the determination of the existence of jurisdiction is but part and parcel of the determination of whether probable cause exists to believe that evidence of a federal crime may be present in the location to be searched.

In the instant case, the applications for Search Warrants 177, 178, and 203 were predicated on an alleged violation of the CWA.  See Apps. for Warrants 177, 178, 203. Thus, the Court must determine whether the affidavits in support of the search warrant applications provided a sufficient basis for the magistrate judge to conclude that there was probable cause to believe that evidence of a violation of this federal statute would be present

in the locations to be searched.  A prerequisite to establishing a violation of the CWA is a finding that the body of water at issue falls under federal jurisdiction.  See 33 U.S.C. § 1311; see also United States v. Interstate Gen. Co., 152 F.Supp.2d 843, 849 (D.Md. 2001) (finding that whether the land at issue fell under CWA jurisdiction was "simply an element of the crime").  As in Miller and Brouillette, this Court's determination of whether the warrant applications and supporting affidavits contained sufficient facts such that the issuing judge "reasonably could have concluded" that evidence of a violation of the CWA would be found at the Florida Camp or the Residence is limited to a review of the warrant applications and accompanying affidavits.  See United States v. Lockett, 674 F.2d 843, 845 (11th Cir. 1982) (stating that "[i]n passing on the validity of the warrant, consideration may be given only to information brought to the attention of the magistrate"); see also United States v. Graham, No. 8:05-CR-461-T-23EAJ, 2006 WL 890661, at * 5 (M.D.Fla. April 6, 2006).  Accordingly, the Court will decline to hold an evidentiary hearing solely to determine whether, based on facts that might be established at such a hearing, there was actual jurisdiction over the body of water at issue.

### 2.     Legal Standard for CWA Jurisdiction

In order to determine whether the affidavits provided the issuing judge with enough facts to reasonably conclude that a CWA violation existed, the Court must first consider whether the CWA extends to the discharge and the waters at issue in this action.  The purpose of the CWA is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  To accomplish this, the CWA

prohibits the "addition of any pollutant[16] to navigable waters from any point source" by any person unless that person has a National Pollution Discharge Elimination System (NPDES) permit.  See 33 U.S.C. §§ 1311, 1362.  A point source is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container . . . from which pollutants are or may be discharged." Id. § 1362(14).  Furthermore, Congress defined the term "navigable waters" to mean "the waters of the United States, including the territorial seas." Id. § 1362(7).

In interpreting the CWA, both the EPA and the Army Corps of Engineers (Corps)[17] have issued regulations extending CWA jurisdiction to waters used in interstate commerce, tributaries of waters used in interstate commerce, and wetlands adjacent to either waters used in interstate commerce or to the tributaries of such waters.  See 33 C.F.R. § 328.3; 40 C.F.R. § 122.2.  In United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 132, 106 S.Ct. 455, 462 (1985), the United States Supreme Court had the opportunity to address the Corps' interpretation of the CWA's jurisdiction.  See 474 U.S. at 133.  In that case, the Supreme Court determined that the Corps reasonably interpreted the CWA to include a wetland immediately adjacent to a navigable waterway.  See id. at 133.  In making this determination, the Supreme Court noted that, "Congress chose to define the waters covered by the [CWA] broadly," and that the "term 'navigable' as used in the [CWA] is of limited import." Id. at 132.  Thus, the Court concluded "congressional concern for protection of

---

[16]      A pollutant is defined as "dredged spoil, waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes . . . discharged into water." 33 U.S.C. § 1362(6).

[17]      Both the EPA and the Corps are charged with enforcing the CWA.  See 33 U.S.C. §§ 1344(s), 1319(a), 1319(b).

water quality and aquatic ecosystems suggests that it is reasonable for the Corps to interpret the term 'waters' to encompass wetlands adjacent to waters as more conventionally defined." Id. at 133.

Then, in 2001, the Supreme Court again considered the breadth of CWA jurisdiction when it decided the case of Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers (SWANCC), 531 U.S. 159, 121 S.Ct. 675 (2001).  The property at issue in SWANCC was an "abandoned sand and gravel pit" that, while not wetlands, was used as a habitat for migratory birds.  See id. at 164-65.  Pursuant to the "Migratory Bird Rule,"[18] the Corps deemed the property to be "waters of the United States."  See id. at 165. In finding that the Corps exceeded its authority, the Court clarified its holding in Riverside by stating that "[i]t was the significant nexus between the wetlands and 'navigable waters' that informed our reading of the CWA in [Riverside]."  Id. at 167.  In SWANCC, the Supreme Court described the waters at issue as "nonnavigable, isolated, intrastate waters," see id. at 174, and concluded that CWA jurisdiction would not extend to "ponds that are not adjacent to open water," id. at 168.  Further, the Court refused to give deference to the Corps' interpretation which extended CWA jurisdiction to the property because to do so would raise constitutional questions.  See id. at 173-74.

After the SWANCC decision, courts disagreed as to the extent that decision limited CWA jurisdiction.  Some courts broadly interpreted  SWANCC as limiting jurisdiction under the CWA to only actual navigable waters or waters adjacent to an open body of navigable

---

[18]      The "Migratory Bird Rule" was issued by the Corps in an attempt to clarify its jurisdiction.  See 51 Fed.Reg. 41216-41217.

water, see In re Needham, 354 F.3d 340, 345-46 (5th Cir. 2003), while others narrowly

interpreted SWANCC as approving CWA jurisdiction over any water that has a "hydrological

connection" with a traditionally navigable water, see United States v. Johnson, 437 F.3d 157,

170 (1st Cir. 2006); United States v. Deaton, 332 F.3d 698, 712 (4th Cir. 2003); see also

Parker v. Scrap Metal Processors, Inc., 386 F.3d 993, 1004 n.11 (11th Cir. 2004) (noting the

split among courts with regard to which bodies of water fall under CWA jurisdiction).

        Most recently, on June 19, 2006, the Supreme Court issued a decision in Rapanos

v. United States, ___ U.S. ___, 126 S.Ct. 2208 (2006) where it once again addressed the

scope of jurisdiction under the CWA.[19]   In Rapanos, the Court considered the question of

whether "wetlands, which lie near ditches or man-made drains that eventually empty into

traditional navigable waters constitute 'waters of the United States' within the meaning of the

[CWA]."   Id. at ___, 126 S.Ct. at 2219.   While the Sixth Circuit Court of Appeals had

---

        [19]    On June 21, 2006, the Court directed the parties to file supplemental memoranda by June 29, 2006 addressing the impact, if any, of the Supreme Court's Rapanos decision on the pending suppression motions. See Order (Dkt. No. 439). Then, on June 26, 2006, the undersigned granted the government's unopposed motion, see Order (Dkt. No. 442), that sought to extend the supplemental memoranda deadline to July 7th because it was in plea discussions with counsel for the remaining Defendants, see Corrected Motion to Extend Time in Which to Comply with Court's Order Re: Supreme Court's Rapanos Decision (Dkt. No. 441). Apparently not succeeding in the plea negotiations, on July 6, 2006 and July 7, 2006, Defendant Evans, Sr. filed two supplemental memoranda of law, see Ronald Robert Evans, Sr.'s Supplemental Memorandum of Law in Support of Motion to Suppress Based on Rapanos Argument (Dkt. No. 452; First Rapanos Memorandum); Ronald Robert Evans, Sr.'s Corrected Supplemental Rapanos Memorandum of Law in Support of Motions to Suppress Based on Invalidity of Search Warrants (Dkt. No. 460; Second Rapanos Memorandum), which were adopted by Defendant Evans, Jr. and Defendant Jequita Evans, see Order (Dkt. No. 473). The government also filed a supplemental memorandum on July 7, 2006. See Government's Memorandum Re: Supreme Court's Rapanos Decision (Dkt. No. 456; Government's Rapanos Memorandum). As Defendant LaBeaud had already signed a plea agreement with the government by the deadline, he did not file a supplemental memorandum or adopt that of Ronald Robert Evans, Sr. See Plea Agreement (Dkt. No. 481) at 12. Accordingly, each party has had the opportunity to fully brief the impact of Rapanos on the pending suppression motions.

concluded that the wetlands were "waters of the United States," because they had a hydrologic connection to nearby drains, ditches or more remote navigable waters, five of the nine justices determined that the case should be vacated and remanded.  See id. at ___, ___, 126 S.Ct. at 2213-14, 2235.  However, there was disagreement amongst those five as to both the reason warranting remand and the standard that should be applied on remand. See id. (Roberts, C.J., concurring).

A plurality of the Court[20] concluded that the Corps' expansive definition of "the waters of the United States" was not "based on a permissible construction of the statute."  See id. at ___, 126 S.Ct. at 2225.  Writing for the plurality, Justice Scalia stated that "on its only plausible interpretation, the phrase 'the waters of the United States' includes only those relatively permanent, standing or continuously flowing bodies of water 'forming geographic features' that are described in ordinary parlance as 'streams[,] . . . oceans, rivers, [and] lakes.'"  Id.  He further explained that this "phrase does not include channels through which water flows intermittently or ephemerally, or channels that periodically provide drainage for rainfall."  Id.  As for the reach of the CWA to adjacent wetlands, the plurality determined that "only those wetlands with a continuous surface connection to bodies that are 'waters of the United States' in their own right . . . are 'adjacent to' such waters and covered by the [CWA]." Id. at __, 126 S.Ct. at 2226 (emphasis in original).  Thus, the plurality found that because the lower court, in relying on the Corps' interpretation in the underlying case, applied the wrong

---

[20]     Justice Scalia delivered an opinion in which Chief Justice Roberts, Justice Thomas, and Justice Alito joined.

standard to determine whether the wetlands at issue were covered "waters of the United States," the case should be remanded for further proceedings. Id. at __, 126 S.Ct. at 2235.

Justice Kennedy wrote a separate opinion in which he concurred in the judgment (i.e., that the case should be remanded), but disagreed with the plurality's refined definition of "waters of the United States," and further rejected the plurality's requirement that wetlands have a surface connection to "waters of the United States" in order to be covered by the CWA. Id. at ___, ___, 126 S.Ct. at 2236, 2242. In his concurrence, Justice Kennedy specifically criticized the plurality's requirement that "waters" must be continuously flowing or that they must be geographic features ordinarily referred to as streams, rivers or oceans. Id. at __, 126 S.Ct. at 2242-43. He also noted his agreement with the dissent's conclusion that the Corps could reasonably interpret the CWA to cover intermittent streams. See id. at __, 126 S.Ct. at 2243. Moreover, Justice Kennedy acknowledged that the Corps' existing standard for determining CWA jurisdiction over tributaries "may well provide a reasonable measure of whether specific minor tributaries bear a sufficient nexus with other regulated waters to constitute 'navigable waters' under the [CWA]." Id. at ___, 126 S.Ct. at 2249. However, he criticized the breadth of this standard "which seems to leave wide room for regulation of drains, ditches and streams remote from any navigable-in-fact water" when used as part of the determination of whether a wetland adjacent to such a tributary is "likely to play an important role in the integrity of an aquatic system comprising navigable waters as traditionally understood." Id. Accordingly, Justice Kennedy did not suggest a different standard for determining whether a particular water was covered by the CWA, rather he focused on the question of what wetlands should be subject to such jurisdiction.

As for the wetlands, Justice Kennedy argued that in order to determine whether the wetlands at issue were covered "waters," the district court should have considered whether there was a "significant nexus" between the wetlands at issue and other "waters that were navigable in fact or that could reasonably be so made." Id. at __, 126 S.Ct. at 2236.  Thus, in his separate concurring opinion, Justice Kennedy articulated that the CWA's jurisdictional threshold for a wetland is met when the wetland in question "significantly affect[s] the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" Id. at __, 126 S.Ct. at 2248.

While Justice Kennedy rejected the plurality's narrow interpretation of the CWA, see id. at __, 126 S.Ct. at 2241-47, he also rejected the expansive interpretation suggested by the dissenting justices, see id. at __, 126 S.Ct. at 2247-48.  Those justices would have found the Corps' broad interpretation of the CWA's jurisdiction reasonable and would have given deference to the Corps determination that the wetlands at issue were "waters of the United States." See id. at __, __, 126 S.Ct. at 2252, 2256 (Stevens, J., dissenting).

As noted by the Chief Justice, none of the three proposed interpretations on the limits of CWA jurisdiction received support from a majority of the justices. See id. at __, 126 S.Ct. at 2236.  As a result, the dissent suggests that in the future the United States may elect to establish CWA jurisdiction under either the plurality's or Justice Kennedy's test. See id. at __ n.14, 126 S.Ct. at 2265 n.14.  The Supreme Court has previously held that "'[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" Grutter v.

Bollinger, 539 U.S. 306, 325, 123 S.Ct. 2325 (2003) (quoting Marks v. United States, 430

U.S. 188, 193, 97 S.Ct. 990 (1977)).  The "narrowest grounds" is understood as the "less far-

reaching" common ground.  See Johnson v. Bd. of Regents of the Univ. of Ga., 263 F.3d

1234, 1247 (11th Cir. 2001).  In this case, it appears that the only common ground between

Justice Scalia's plurality opinion and Justice Kennedy's concurrence is that the Sixth Circuit

erred in merely applying the "hydrological connection" test to determine whether the CWA's

jurisdiction extended to the wetland at issue.  See Rapanos, __ U.S. at __, __, 126 S.Ct. at

2235, 2250-51.  However, because both articulated different standards to be applied on

remand, it is not clear which standard is now controlling.  See id. at __, 126 S.Ct. at 2236

(Roberts, C.J., concurring); see also Johnson, 263 F.3d at 1248 n.12 (noting that "the

Supreme Court has recognized that there will be situations where no binding 'rule' may be

taken from a fractured decision") (citing Nichols v. United States, 511 U.S. 738, 745-46, 114

S.Ct. 1921 (1994)).  Accordingly, consistent with Justice Stevens' opinion, see Rapanos,

__, U.S. at __, 126 S.Ct. at 2265 n.14, this Court will consider the jurisdictional requirement

for "waters of the United States" to be met if the affidavits satisfy either the plurality's test (a

relatively permanent, standing or continuously flowing water) or the general parameters of

Justice Kennedy's concurrence (a tributary that feeds into a traditional navigable water; not

necessarily a continuously flowing stream, river or ocean, but perhaps also not a ditch or

drain), see id. at __, ___, 126 S.Ct. at 2242-43, 2249.

The plurality opinion also addressed the impact of its restriction of the definition of

"waters of the United States" on enforcement actions aimed at "traditional water polluters."

Id. at __, 126 S.Ct. at 2227.   In determining that the Corps' interpretation of "waters of the

United States" was impermissibly broad, the plurality was careful to note that a more narrow interpretation would not significantly affect the enforcement mechanisms in the CWA. Id. As support for this conclusion, the plurality explained that the CWA does not simply "forbid the 'addition of any pollutant directly to navigable waters from any point source,' but rather the 'addition of any pollutant to navigable waters.'" Id. (emphasis in original).  Given this distinction, the plurality explained,

> [t]hus from the time of the CWA's enactment, lower courts have held that the discharge into intermittent channels of any pollutant that naturally washes downstream likely violates § 1311(a) even if the pollutants discharged from a point source do not emit "directly into" covered waters, but pass "through conveyances" in between.

Id. at 15 (emphasis in original).  As examples of such holdings, the plurality went on to cite, with apparent approval, two cases holding that a discharge, though not directly emitted into covered waters, nonetheless, violated § 1311(a) where the pollutant was "washe[d] downstream" into a covered water.  Id. (citing United States v. Velsicol Chemical Corp., 438 F.Supp. 945, 946-47 (W.D.Tenn. 1976); Sierra Club v. El Paso Gold Mines, Inc., 421 F.3d 1133, 1137, 1141 (10th Cir. 2005)).

In Velsicol Chemical Corp., the defendant argued that the discharge in question was not covered by the CWA because it was discharged into a sewer system rather than directly into "the waters of the United States."  See 438 F.Supp. at 946-47.  However, the Tennessee district court found that argument unavailing because it determined that the fact that a discharge flowed through a conveyance before reaching a covered water did not remove the discharge from the CWA's jurisdiction.  See id. at 947.  Similarly, in the Sierra Club case, the pollutant was discharged into a shaft which emptied into a tunnel which, in turn, traveled 2.5

miles before discharging into a navigable water.  See 421 F.3d at 1137.  In reviewing the

issue of subject matter jurisdiction, the Tenth Circuit concluded that CWA jurisdiction was

established, in part, because the discharge was from a point source, the shaft, that merely

flowed through "other conveyances" before reaching a navigable water.  See id. at 1141.

Therefore, it appears that even after Rapanos, the discharge of a pollutant from a point

source that is then indirectly discharged into a covered water because it flows through

intermittent conveyances is subject to the CWA's jurisdiction.  See Rapanos, __ U.S. at _

, 126 S.Ct. at 2227.

As further explanation for its conclusion that the refined definition of "waters of the

United States" espoused in its opinion would not significantly affect the enforcement of 33

U.S.C. § 1342, the plurality referred to the many cases in which courts have held that

"upstream, intermittently flowing channels themselves constitute 'point sources' under the

[CWA]."  Id. (citing United States v. Ortiz, 427 F.3d 1278, 1281 (10th Cir. 2005) (upholding

the jury's determination that the conveyance itself could be the point source); Dague v.

Burlington, 935 F.2d 1343, 1354-66 (2d Cir. 1991) (affirming the district court's determination

that a culvert was the point source), rev'd, in part, on other grounds, 505 U.S. 557, 112 S.Ct.

2638 (1992)).[21]  In calling attention to these cases, the plurality again appears to be citing

their interpretations with approval.  See id.  Indeed, it specifically noted that the CWA

"'makes plain that a point source need not be the original source of the pollutant; it need only

---

[21]     Rapanos also noted, with apparent approval, that some courts have applied
both the "'indirect discharge' rationale and the 'point source' rationale in the alternative . . . ."
Id. (citing Concerned Area Residents for Env't v. Southview Farm, 34 F.3d 114, 118-19 (2d Cir.
1994)).

convey the pollutant to "navigable waters.""" Id. (citing South Florida Water Mgmt. Dist. v. Miccosukee Tribe, 541 U.S. 95, 105, 124 S.Ct. 1537 (2004)).  Moreover, in one of the cases cited by the plurality, Dague, the Second Circuit opined that "[t]he definition of a point source is to be broadly interpreted" and specifically rejected the defendant's argument that the culvert could not be the point source because it did not functionally "add" the pollutant to navigable waters but merely conveyed it to a navigable water from another point source. Dague, 935 F.2d at 1354.  Consequently, even where the pollutant itself is not directly discharged into a covered body of water, a court may find a violation of § 1311(a) if the pollutant is conveyed into a covered water by a point source.  Rapanos, __ U.S. at __, 126 S.Ct. at 2227.

In light of the foregoing, it appears CWA jurisdiction can be established in this case if the affidavits in the instant case contained sufficient facts for the issuing judge to reasonably conclude that the creek seen running behind the Florida Camp property was itself a covered water or conveyed the pollutant downstream to a covered water.

### 3.   Whether the affidavits supported a finding that the waters at issue were subject to CWA jurisdiction

The Court must now consider whether the affidavits[22] submitted to the issuing judge presented sufficient facts to permit that judicial officer to reasonably conclude that CWA

---

[22]   The affidavits submitted in support of the applications for Search Warrants 177 and 178 are for all practical purposes identical.  With regard to the application for Search Warrant 203, the facts establishing CWA jurisdiction are contained in Exhibit 1, which is a duplicate of the affidavit submitted in support of the application for Search Warrant 177.  Thus, the Court will not refer to it separately.

jurisdiction[23] extended to the creek seen running behind the Florida Camp.[24]   The Court

_____

[23]     As a preliminary matter, the Court will quickly address Defendants' bold assertion that the issuing judge did not consider jurisdiction when making his probable cause determination.  See Tr. at 75-78.  A review of the applications and affidavits submitted in support of Search Warrants 177, 178, and 203 makes it abundantly clear that the issuing judge did consider whether the body of water located behind the Florida Camp fell under CWA jurisdiction.  As originally presented to the issuing judge, the affiant's paragraph 16 of the affidavit submitted in support of the request for Search Warrants 177 and 178 which was also incorporated by reference in the application for Search Warrant 203 merely stated that Mr. Hart, a Corps Specialist, confirmed "that the creek running behind the [Florida Camp] is the headwaters of Cow Creek, a tributary of the St. Johns River."  Aff. for Warrants 177 and 178 ¶ 16.   However, the issuing judge, not satisfied that this representation adequately demonstrated CWA jurisdiction over the creek, had the affiant insert additional language intending to clarify jurisdiction.  Thus, paragraph 16, as relied upon by the issuing judge in making his probable cause determination, also stated:

> On June 2, 2005, I spoke again with Hart to clarify what he meant by the term, "headwaters."  Mr. Hart told me that he meant "headwaters" to be the first section of a body of water that is identifiable as that body of water.  By headwaters of Cow Creek, he meant the first identifiable section of Cow Creek.  He confirmed that the creek I viewed, with visibly flowing water, running behind the [Florida Camp], is Cow Creek, a tributary of the St. Johns River.

Id.  Thus, the issuing judge apparently recognized that for the CWA jurisdiction to extend to the creek, the affidavits needed to include additional facts to clarify that the creek the affiant saw flowing behind the Florida Camp flows into or was a part of Cow Creek which itself flows into the St. Johns River, a traditionally navigable water.  Accordingly, the Court finds that the issuing judge did consider CWA jurisdiction before finding probable cause to search based on a CWA violation.

[24]     During the hearing, Defendants proffered a description of the Florida Camp property to better explain their assertion that the discharge alleged does not fall under the CWA's jurisdiction.  Indeed, they proffered that if one were to go to the Florida Camp:

> what [one] would find is that there is a manmade ditch that runs behind the camp property from an adjoining field . . . that sometimes it's dry and sometimes it's wet, and sometimes the water is deep, and sometimes it's shallow, and sometimes after a heavy rain or when there's discharge from one of these fields that empties into the ditch, that it flows, and maybe most of the time it doesn't.  And this ditch runs until you can't follow it anymore because the underbrush is thick.  And then you go around about a . . . half mile onto a road and you find a culvert.  Quite obviously, another manmade structure.  And at some point . . . water comes out of the woods in a depression that looks manmade . . . at the end of this [is a] drainage ditch that runs along side of a state road.  From there, eventually it meanders down the state road to a point there's a pipe that runs under the road.  That pipe conveys the water from that roadside ditch, . . . to yet

(continued...)

recognizes that the <u>Rapanos</u> standard was announced by the Supreme Court subsequent

to the issuance of the search warrants in this case, and therefore, that the issuing judge

applied a different standard when he reviewed the supporting affidavits for probable cause.

However, as the Supreme Court was merely interpreting an existing statute, this Court is

bound to the current correct interpretation of that statute.  <u>See</u> <u>Rivers v. Roadway Express,</u>

<u>Inc.</u>, 511 U.S. 298, 311-13 & n.12, 114 S.Ct. 1510 (1994) (noting that when the Supreme

Court "construes a statute, it is explaining its understanding of what the statute has meant

continuously since the date when it became law"); <u>see also</u> <u>United States v. Estate of</u>

<u>Donnelly</u>, 397 U.S. 286, 294-95, 90 S.Ct. 1033 (1970).

In support of the requests for the search warrants, Agent Mowatt asserted that on

May 24, 2005, he viewed a seven to eight foot wide creek, with visibly flowing water and a

depth of up to one foot, running behind the Florida Camp.  <u>See</u> Affidavits for Warrant 177 ¶

14 and 178 ¶ 14.  He also observed a white PVC pipe protruding from the Florida Camp

property discharging what appeared to be waste water directly into the creek.  <u>See</u> <u>id.</u>  ¶ 22.

---

[24](...continued)
another ditch, which is cut across another piece of property which is high, dry ground.
It goes through a field which is cultivated . . . . That ditch apparently eventually empties
into . . . Cow Creek. . . .  And at that point, the creek is clearly not navigable, it's wetland
type area, and there's really no evidence that, but for that culvert, the water in that creek
wouldn't just soak into the ground right in that spot and never reach the St. Johns.  And
then we take it on . . . the EPA's assertion, that eventually that creek meanders through
various more land, and five or six miles away, empties into the St. Johns River.

Tr. at 103-04.  While the Court finds this description helpful, it must base its probable cause
determination on the facts that were set forth in the affidavits supporting the applications.
Therefore, the Court will not consider this description in making the probable cause
determination.  <u>See</u> <u>United States v. Lockett</u>, 674 F.2d 843, 845 (11th Cir. 1982).  However,
to the extent it is helpful in determining whether Defendants are entitled to an evidentiary
hearing pursuant to <u>Franks</u>, <u>see</u> <u>infra</u>, the Court will consider it.

Agent Mowatt went on to state that in the area where the PVC pipe was discharging, he recognized a substantial quantity of human waste as well as the "strong, pugent odor of raw human waste." Id. Agent Mowatt explained that he and Jon Griffin, of the Corps, utilizing city tax maps and aerial photographs, identified this creek as the headwaters of Cow Creek, which flows directly into the St. Johns River, a body of water used in interstate and foreign commerce.[25] See id. ¶ 15. Agent Mowatt also swore that he spoke with Thaddieus L. Hart, a Corps Environmental Protection Specialist for Palatka, Florida, see id. ¶ 16, and that Mr. Hart confirmed that the creek in question was the headwaters or "first identifiable section" of Cow Creek, a tributary of the St. Johns River, see id.

The statements contained in the affidavits supporting the applications for Search Warrants 177 and 178 suggest that the creek running behind the Florida Camp is a section of Cow Creek which naturally flows into the St. Johns River, a navigable-in-fact water. The allegations also suggest that Cow Creek is a relatively permanent body of water, as the agent avers that he and other agents identified it, in part, from a review of county tax maps which show the creek and also confirm its flow into the St. Johns River. They further explained that Cow Creek is a tributary of the St. Johns River. The allegations also support a finding that the creek was a continuously flowing body of water given the assertion that it is 7-8 feet wide, with a depth up to one foot and had visibly flowing water. While the plurality did not specifically reference a "creek" in its discussion, it did acknowledge that streams were

---

[25]     Defendants do not contest that the white PVC pipe discharged a pollutant directly into the creek (or ditch as their counsel characterized it) nor do they contest that the St. Johns River is a navigable-in-fact waterway, see also United States v. Tilton, 705 F.2d 429, 430 (11th Cir. 1983) (concluding, without discussion, that the St. Johns River is a navigable water).

properly considered waters because a stream connotes a continuous flow of water and does not encompass transitory puddles or ephemeral flows of water.  Rapanos, __ U.S. at __, __, 126 S.Ct. at 2221, 2225-26.  A creek is defined as "a natural stream of water normally smaller than and often a tributary to a river or a small inlet or bay narrower and extending farther inland than a cove."  Miriam-Webster's Collegiate Dictionary (10th ed. 2002).  These allegations are sufficient to support a finding that there was probable cause to believe the creek fell within the definition of "waters of the United States" regardless of whether one applies the plurality's test or the broad parameters suggested by Justice Kennedy.[26]

---

[26]     Defendants also contend that if the property at issue falls under CWA jurisdiction, then Congress exceeded its powers to regulate commerce pursuant to the Commerce Clause.  See Supplemental Memorandum at 3.  At no time have Defendants pointed to any relevant legal authority in support of this position.  Moreover, the Supreme Court has routinely held that Congress may regulate the following three categories of activity pursuant to its commerce power: 1) channels of interstate commerce; 2) instrumentalities of interstate commerce; and 3) economic "activities that substantially affect interstate commerce."  United States v. Morrison, 529 U.S. 598, 608-09 (2000) (citations omitted).  The CWA was enacted under Congress' authority to regulate channels of interstate commerce.  See SWANCC, 531 U.S. at 172 (Congress enacted the CWA pursuant to "its traditional jurisdiction over waters that were or had been navigable in fact or which could reasonably be so made"); see also United States v. Deaton, 332 F.3d 698, 706 (4th Cir. 2003) (concluding that Congress enacted the CWA under its power over channels of interstate commerce); United States v. Johnson, 437 F.3d 157,175-76 (1st Cir. 2006) (same).  This authorizes Congress to keep channels of interstate commerce, including navigable waters, "'free from immoral and injurious uses.'"  Deaton, 332 F.3d at 706-07 (quoting Caminetti v. United States, 242 U.S. 470, 491(1917)). This power "also carries with it the authority to regulate nonnavigable waters when that regulation is necessary to achieve Congressional goals in protecting navigable waters."  Id. at 707; see also United States v. Hubenka, 438 F.3d 1026, 1032 (10th Cir. 2006) (finding that "congressional authority is not limited to navigable-in-fact waters; it exists throughout watersheds and can encompass actions on nonnavigable, intrastate tributaries").  Furthermore, implicit in the Rapanos plurality decision is that their revised definition of what constitutes "waters of the United States" does not exceed Congress' commerce power.  See Rapanos, __ U.S. at __, 126 S.Ct. at 2224.  Thus, the undersigned finds the suggestion that Congress does not have the authority to regulate a non-navigable creek under the CWA to be without merit.

The government also suggests that the Court may find that the affidavits established probable cause of a CWA violation by relying on the plurality's statement that narrowing the CWA's jurisdiction would not affect "traditional water polluters" because a court may apply the "indirect discharge" or "point source" rationales.  See Government's Rapanos Memorandum at 6-7.  The government argues that the affidavits establish that Defendant Evans, Sr. piped raw, untreated human excrement into a creek which flowed into the St. Johns River.  See id. at 6.  It asserts that Justice Scalia's statement that a person would be liable for a violation of the CWA if that person is responsible for addition of a pollutant to navigable waters even if that pollutant arrives at the navigable waters because it naturally washes downstream supports a conclusion that the affidavits provided the issuing judge with sufficient facts to conclude that probable cause existed to believe Defendant Evans, Sr. was violating the CWA.  However, the cases endorsed by Justice Scalia that discuss a criminal violation of the CWA based upon either the "indirect discharge" or "point source" rationale, appear to require facts suggesting that the polluter knew or should have known that the pollutant was being discharged into a covered navigable water.  See Velsicol, 438 F.Supp. at 947; Ortiz, 427 F.3d at 1281-83.  Thus, it would appear that in the instant case if the Court were to find that the creek was merely a point source or a conveyance, it would also need to find probable cause to believe that Defendant Evans, Sr. knew the pollutant was reaching the St. Johns River.  The government has not identified any allegations that suggest that Defendant Evans, Sr. knew the pollutant was being discharged into the St. Johns River.  Therefore, the Court will not address whether the issuing judge could have found probable cause pursuant to either the "indirect discharge" or "point source" rationale.

Having determined Defendants are not entitled to an evidentiary hearing on the issue of whether CWA jurisdiction extends to the creek behind the Florida Camp, the undersigned finds, based on the facts alleged in the affidavits, that the issuing judge "reasonably could have concluded" that there was probable cause to believe CWA jurisdiction extended to the creek and therefore to the alleged discharge from the Florida Camp.   Therefore, the undersigned concludes that the Defendants' argument that the Court lacked jurisdiction to issue Search Warrants 177, 178, and 203 is without merit.

**4.    Entitlement to a <u>Franks</u> Hearing**

Defendants also challenge these three warrants by contending that Agent Mowatt either recklessly omitted important information from his affidavits or made statements in reckless disregard for the truth in the affidavits submitted in support of the applications for Search Warrants 177, 178, and 203.[27]   <u>See</u> Tr. at 138-39.   As a result, they request an evidentiary hearing pursuant to <u>Franks v. Delaware</u>[28] to bring forth evidence supporting this argument.   In response, the government argues that Defendants are not entitled to an evidentiary hearing because they have not shown that a false statement was intentionally included in the affidavits nor have they shown that any alleged omission would have affected the probable cause determination.   <u>See</u> Response to Supplemental Memorandum at 4; Tr. at 144-45.

---

[27]      Both Search Warrants 177 and 178 were based entirely on Agent Mowatt's affidavit.   <u>See</u> App. for Warrant 177; App. for Warrant 178.   Agent Mowatt also submitted a second affidavit in support of Search Warrant 203 which also incorporated the affidavit from Search Warrant 177.   <u>See</u> Aff. for Warrant 203 ¶ 7.   Thus, Search Warrant 203 is also affected by this <u>Franks</u> hearing request.

[28]      <u>Franks v. Delaware</u>, 438 U.S. 154 (1978).

The United States Supreme Court recognized in Franks that there are certain limited circumstances when a defendant may challenge the veracity of the sworn affidavit used in support of an application for a warrant. See 438 U.S. at 155-56. In its decision, however, the Supreme Court emphasized that the affidavit is to be accorded a presumption of validity. See id. at 171. Thus, in order to challenge the statements made in the affidavit, the defendant must first "make[] a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and [that] the allegedly false statement is necessary to the finding of probable cause." Id. at 155-56. Specifically, the Court elaborated:

> To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. . . . Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required.

Id. at 171-72.

Therefore, in order to obtain an evidentiary hearing, the defendant must show that the affiant acted knowingly and intentionally or with reckless disregard for the truth. See United States v. Burston, 159 F.3d 1328, 1333 (11th Cir. 1998); United States v. Sims, 845 F.2d 1564, 1571 (11th Cir. 1988); United States v. Abbell, 963 F.Supp. 1178, 1194 (S.D. Fla. 1997); see also United States v. Hanhardt, 157 F.Supp.2d 978, 992 (N.D. Ill. 2001). If he

or she satisfies this first prong, then the defendant must also show that "the false statement was necessary to the finding of probable cause" or that the "inclusion of the [omitted] facts would have prevented a finding of probable cause." Sims, 845 F.2d at 1571; United States v. Jenkins, 901 F.2d 1075, 1080 (11th Cir. 1990). Insignificant, negligent, or immaterial misrepresentations or omissions are insufficient to warrant a hearing. See Jenkins, 901 F.2d at 1080; Sims, 845 F.2d at 1571; United States v. Astroff, 578 F.2d 133, 136 (5th Cir. 1978); see also West Point-Pepperell, Inc. v. Donovan, 689 F.2d 950, 959 (11th Cir. 1982).

In this case, Defendants request an evidentiary hearing to challenge the veracity of certain statements included in Agent Mowatt's affidavit. See Tr. at 138-139. Specifically, they assert that the affidavits contain two (2) misrepresentations.[29] See Supplemental Memorandum at 2-4; Tr. at 152-161. Defendants also assert that Agent Mowatt's affidavit is deficient because he omitted six relevant facts. See id. The Court will first consider the alleged misrepresentations. Defendants assert that the affiant included the following two false statements in the affidavits: (1) any reference to the creek behind the Florida Camp as a creek instead of a ditch, (Aff. for Warrant 177 ¶¶ 14, 15, 16, 22, 31; Aff. for Warrant 178 ¶¶ 14, 15, 16, 22, 31); and (2) any reference to the creek behind the Florida Camp as

---

[29]     Defendant Evans, Jr. also alleges that the affiant's description of the discharge in the affidavit for Search Warrant 203 as a "continuous" discharge of pollutant as opposed to a "sporadic" discharge of a pollutant is a misstatement. See Tr. at 161-62. However, Defendant Evans, Jr. did not state where in the affidavit this statement was made and the Court, upon its own review was unable to find this statement or a similar statement in the affidavit. Indeed, a review of the affidavit reveals that, contrary to Defendant Evans, Jr.'s argument, the affiant included information showing that the septic system did not continuously discharge pollutants into the creek. See Aff. for Warrant 203 ¶¶ 11-15. Thus, the Court finds that there was no misstatement and therefore that this argument is without merit.

"headwaters," (Aff. for Warrant 177 ¶¶ 15, 16; Aff. for Warrant 178 ¶¶ 15, 16). <u>See</u> Tr. at 157.

With respect to the first alleged misstatement, Defendants contend that calling the water that the affiant viewed behind the Florida Camp a creek was a misstatement because it was clearly a ditch. <u>See</u> Tr. at 152-53. They contend that in common usage of the word "creek," the water found behind the Florida Camp could not be considered a creek. <u>See id.</u> Initially, the Court notes that Defendants have not presented an affidavit or other sworn statement to support their contention that the body of water observed by Agent Mowatt is in fact a ditch rather than a creek. During the hearing on the motion to suppress, defense counsel provided his description of the water as a "man made ditch"[30] and offered to provide statements in support of his description. <u>See</u> Tr. at 140-41. In response, the government indicated its willingness to accept counsel's description for purposes of the proffer. <u>See id.</u> at 145. In light of the government's agreement, this proffer may well be sufficient to suggest that Agent Mowatt improperly characterized the water as a "creek." However, Defendants have still fallen short of satisfying their <u>Franks</u> burden because they have failed to put forth any evidence whatsoever to suggest that Agent Mowatt referred to the water as a "creek" knowing that description to be false or with reckless disregard for the truth of the statement.

Defendants rely on their mere assertion that the definition of the word creek, as used in everyday language, would not include the water found behind the Florida Camp. However, the mere fact that the statement was incorrect does not show that the affiant's description of the water as a creek was a misstatement made in reckless disregard for the

---

[30]     <u>See</u> Tr. at 103-04.

truth.[31]   Although there are differences between the definition of a creek and a ditch, the Court has not been provided with any evidence to support a conclusion that calling this particular waterway a "creek" rather than a "ditch" was so erroneous as to constitute reckless disregard for the truth.   Indeed, the Court has not been provided with any information to suggest that Agent Mowatt considered the water to be a ditch, rather than a creek, nor has the Court been provided with any evidence to suggest that the statements contained in the affidavit explaining the efforts made by Agent Mowatt to confirm that the waterway was indeed a section of Cow Creek were false or that he included those allegations with reckless disregard of the truth.

The Eleventh Circuit recently addressed this situation in United States v. Arbolaez, 450 F.3d 1286, 1293-94 (11th Cir. 2006) (per curiam) (noting that a defendant must make a substantial preliminary showing to warrant a Franks hearing).   There, the evidence of a false statement was strong, and despite the fact that there was support for the defendant's claim that the officer included a false statement in the affidavit, the court upheld the denial of a Franks hearing because there was "no affidavit or otherwise sworn statement alleging that [the officer] knowingly or recklessly included false statements in the search warrant." Id. at 1294.   Accordingly, the court concluded that the defendant had failed to make the requisite substantial preliminary showing to warrant an evidentiary hearing.   See id.   In doing so, the court emphasized that the "substantiality requirement is not lightly met."   Id.   Having

---

[31]   As previously noted, a creek is "a natural stream of water normally smaller than and often a tributary to a river or a small inlet or bay narrower and extending farther inland than a cove." Miriam-Webster's Collegiate Dictionary (10th ed. 2002).   A ditch, on the other hand, is "a long, narrow excavation dug in the earth."   Id.

considered the proffer made by Defendants, the undersigned concludes that they have failed to satisfy the substantiality requirement as they have provided no evidence that Agent Mowatt's reference to the water as a creek, even if false, was made knowingly or with reckless disregard of the truth.

As for the second alleged misstatement, the description of the body of the water behind the camp as the "headwaters of Cow Creek," Defendants have again failed to satisfy the preliminary showing necessary to warrant an evidentiary hearing.  Interestingly, the Court notes that Defendants made no specific assertion that the body of water was not the headwaters of Cow Creek.  Instead it appears that Defendants believe that counsel's description of the body of water based upon his personal observation of it should be sufficient to establish that the body of water is not in fact the "headwaters of Cow Creek." However, Defendants' reliance on counsel's personal observation or his definition of "headwaters" is insufficient to warrant a <u>Franks</u> hearing.

The affidavits in support of Search Warrants 177 and 178 state that the affiant physically went to the Florida Camp and viewed running water behind the property.  <u>See</u> Aff. for Warrants 177 and 178 ¶ 14.  Defendants did not suggest this was a misstatement.  <u>See</u> Tr. at 157.  The affidavits next state that the affiant went to two separate persons, who were apparently knowledgeable about the waters in the Palatka, Florida area and CWA regulations, who identified that water as the "headwaters of Cow Creek."  <u>See</u> Aff. for Warrants 177 and 178 ¶¶15, 16.  Additionally, one of those individuals further explained to the affiant that by "headwaters of Cow Creek" he meant the first identifiable section of Cow Creek.  <u>See id.</u> ¶16.  Defendants have provided no evidence that the affiant did not truthfully

report the information given to him nor have they provided any evidence that the statements themselves are false.  <u>See</u> Tr. at 157-58.  Thus, while the proffer given by counsel for Defendant Evans, Jr. concerning the somewhat attenuated flow of the creek may be true, Defendants have failed to show that the statements contained in the affidavit concerning the body of water and its identification as the headwaters of Cow Creek were false.  Moreover, Defendants have provided no evidence whatsoever to support a conclusion that, if the body of water was not the headwaters of Cow Creek, Agent Mowatt nonetheless provided the Court with that information knowing it to be false or with reckless disregard for the truth.  Accordingly, the undersigned concludes that Defendants have failed to make a preliminary hearing to warrant an evidentiary hearing with regard to these alleged misstatements.

Defendants also assert that they are entitled to a <u>Franks</u> hearing because the affiant omitted the following facts from the affidavits: (1) the quantity of discharge was <u>de minimis</u>; (2) the ditch is a drainage ditch for adjacent farms; (3) the distance between the ditch to the St. Johns River is significant; (4) the lack of impact of the pollutant on the St. Johns River; (5) the ditch is man-made; and (6) the ditch only flows intermittently depending on the farm irrigation.  <u>See</u> Supplemental Memorandum at 2-4.

The first and fourth alleged omissions are related.  Defendants first allege that the affidavit failed to notify the magistrate judge that the quantity of discharge was <u>de minimis</u>, then in the fourth alleged omission, Defendants suggest that the affiant should have notified the magistrate judge of the lack of impact of the pollutant on the St. Johns River.  Unfortunately, these Defendants have put forth no evidence regarding the quantity of the discharge or its impact on the St. Johns River.  Thus, Defendants have failed to make any

showing, much less a "substantial preliminary showing" that the discharge was in fact <u>de minimis</u> or that it did not impact the river.  The naked assertion based upon nothing more than counsel's personal belief is simply insufficient to warrant a <u>Franks</u> hearing.

Even if one were to rely on counsel's conclusion that the discharge was <u>de minimis</u> and had little or no impact on the St. Johns River, they have still fallen short of satisfying their <u>Franks</u> burden.  To warrant a <u>Franks</u> hearing, Defendants must show that a material fact was omitted and that the omission was made intentionally or with reckless disregard for the accuracy of the affidavit.  <u>United States v. Martin</u>, 615 F.2d 318, 328 (5th Cir. 1980).  Defendants have failed to establish that informing the Court that the discharge was <u>de minimis</u> or had little impact was a relevant omission.  The CWA sets a zero discharge standard, and therefore, there does not appear to be a <u>de minimis</u> exception[32] to the

---

[32]    The Eleventh Circuit has, however, recognized a narrow exception to the CWA's "zero discharge" standard in circumstances where "(1) compliance with such a standard is factually impossible; (2) no NPDES permit covering such discharge exists; (3) the discharger was in good-faith compliance with local pollution control requirements that substantially mirrored the proposed NPDES discharge standards; and (4) the discharges were minimal." <u>Hughey</u>, 78 F.3d at 1530.  Defendants contend that even if there is no <u>de minimis</u> exception to CWA compliance, the affiant should have addressed the <u>Hughey</u> standard in the affidavit because it goes to the issue of whether the EPA had jurisdiction over the discharge.  <u>See</u> Tr. at 80-81.  However, the exception set forth in <u>Hughey</u> is not relevant to the question of whether a particular water is subject to CWA jurisdiction.  Moreover, the <u>Hughey</u> exception would not apply in this instance because Defendants cannot satisfy the first prong: that compliance with the zero discharge standard was factually impossible.  <u>Id.</u>; <u>see also</u> <u>Driscoll v. Adams</u>, 181 F.3d 1285, 1289 (11th Cir. 1999) (nothing that all four elements of the <u>Hughey</u> exception must be satisfied).  In <u>Hughey</u>, the discharge in question was storm water, and the court found that "'[z]ero discharge of storm water <u>will never be achieved</u> because rainfall must find its way back into the streams and rivers of this state.'" <u>Id.</u> at 1530.  Conversely, in this case, the discharge alleged is overflow from a septic tank.  <u>See</u> Tr. at 161; Aff. for Warrant 203 ¶ 12.  It is <u>factually possible</u> to stop such discharge because Defendants could simply stop using the septic tank, correct the overflow, or prevent the discharge from entering the creek.  <u>See</u> <u>Ass'n to Protect Hammersley ELD, and Totten Inlets v. Taylor Res., Inc.</u>, 299 F.3d 1007, 1013 (9th Cir. 2002) (finding that the first <u>Hughey</u> factor was not met because the defendant could "simply cease operations" in order to comply with the CWA); <u>United States Public Interest Research Group</u>

(continued...)

proscription against a discharge in violation of the CWA.  <u>See</u> 33 U.S.C. § 1311(a) (without

a permit "the discharge of any pollutant by any person shall be unlawful"); <u>see also</u> <u>Hughey</u>

<u>v. JMS Dev. Corp.</u>, 78 F.3d 1523, 1529 (11th Cir. 1996) (stating that the "CWA imposes a

'zero discharge' standard in the absence of an NPDES permit"); <u>United States v. Gerke</u>

<u>Excavating, Inc.</u>, 412 F.3d 804, 806 (7th Cir. 2005) ("to protect commerce Congress must

be able to regulate an entire class of acts if the class affects commerce, even if no individual

act has a perceptible effect"); <u>Driscoll</u>, 181 F.3d at 1288 (noting that the CWA absolutely

prohibits the discharge of any pollutant absent a proper permit).  Finally, Defendants have

not only failed to substantiate their claim that an omission was made, but they made no effort

to establish that the omission was made "intentionally or with a reckless disregard for the

truth."  <u>See</u> <u>Arbolaez</u>, 450 F.3d at 1294.  Accordingly, Defendants have failed to make a

sufficient preliminary showing to warrant a <u>Franks</u> hearing.

The second and fifth alleged omissions relate to the description of the body of water

seen behind the camp.  While Agent Mowatt referred to it as a creek, defense counsel

asserts that it is more properly described as a ditch, and that it is a man made ditch.  As

previously noted, Defendants rely only on their counsel's assertion that the body of water

was in fact a ditch.  However, the government indicated its willingness to accept that

---

[32](...continued)
<u>v. Stolt Sea Farm, Inc.</u>, 2002 WL 240386 at *14 (D.Me. Feb. 19, 2002) (finding that the
defendant did not meet the first <u>Hughey</u> factor because he was "responsible for creating a
circumstance in which the discharge of pollutants is required . . . .").  Indeed, <u>Hughey</u> itself
noted that the circumstance before it "was not a case of a manufacturing facility that could
abate the discharge of pollutants by ceasing operations."  78 F.3d at 1530.  Thus, because
Defendants could not have established that compliance with the zero discharge standard was
impossible, the <u>Hughey</u> exception would not apply, and therefore, regardless of whether the
discharge was <u>de minimis</u>, the affiant did not need to include this information in the affidavit.

description rather than require a sworn statement or other proof.  Again, while this may be sufficient to suggest that Agent Mowatt made an omission by failing to notify the magistrate judge that the water was a man made ditch, it does not support a finding that he did so intentionally or with a reckless disregard for the truth.  Indeed, the fact that Agent Mowatt relied upon maps and opinions of knowledgeable professionals supports a contrary conclusion.

As to the third asserted omission, the undersigned finds that Defendants have failed to allege any facts to support a conclusion that the distance from the creek to the St. Johns River was a material omission.  Indeed, the relevant inquiry is either whether the creek itself was a relatively permanent flowing body of water not what distance the creek traveled to meet up with a navigable-in-fact water.  See Rapanos, ___ U.S. at ___, ___, 126 S.Ct. at 2225, 2248.  Moreover, Defendants again failed to make any showing that Agent Mowatt failed to include the distance from the creek to the river intentionally or with reckless disregard of the truth.  A showing that the omissions were relevant and deliberately excluded or excluded with reckless disregard of the truth are prerequisites to finding that a Franks hearing is warranted.  See Jenkins, 901 F.2d at 1080. Defendants failed to meet this threshold burden.

Turning finally to the sixth alleged omission, Defendants contend that Agent Mowatt omitted the fact that the ditch only flows intermittently depending on farm irrigation. See Supplemental Memorandum at 2.  However, Defendants have failed to show that Agent Mowatt was aware that the creek he viewed running behind the Florida Camp property did not flow all of the time.  Furthermore, when specifically queried by the Court, Defendants

admitted that they had no evidence to suggest that when Agent Mowatt viewed the creek it was not visibly flowing.  See Tr. at 157.  Also, Defendants have failed to demonstrate that Agent Mowatt omitted the fact that the creek only flowed intermittently purposefully or with reckless disregard for the truth.  See Jenkins, 901 F.2d at 1080.  Thus, the undersigned finds that Defendants have failed to meet their initial burden to demonstrate that a Franks hearing is necessary on this issue.

In light of the foregoing, the undersigned concludes that Defendants have failed to make a preliminary showing to warrant an evidentiary hearing with regard to any of the alleged misstatements or the alleged omissions.  As this evidentiary hearing request and the foregoing argument concerning CWA jurisdiction were the only issues raised in the Second Motion to Suppress and the Fourth Motion to Suppress, and as the Court has found both contentions without merit, the undersigned will recommend that the Second Motion to Suppress and the Fourth Motion to Suppress be denied.  In addition, to the extent the Fifth Motion to Suppress sought exclusion based upon the absence of CWA jurisdiction, the Court will recommend that it be denied.  In light of these recommendations, the suggestion that evidence discovered from subsequent search warrants issued, in part, based upon information derived from these search warrants must be suppressed as fruit of the poisonous tree is without merit.

**B.    First Motion to Suppress - Search Warrant 182**

The Evans' challenge Search Warrant 182 based upon their assertion that the affidavit in support of Search Warrant 182 failed to establish probable cause to believe that

evidence of a crime would be found at the Residence.[33]  See Memorandum in Support of

---

[33]      During the hearing, Defendant Evans, Sr. withdrew two arguments concerning Search Warrant 182. Initially, he had asserted that Search Warrant 182 was invalid because Exhibits A and B, describing the place to be searched and things to be seized, and Exhibit 1, Agent Wescott's affidavit submitted in support for Search Warrant 119, were missing from the application and affidavit for Search Warrant 182 in the Court's record. See id. at 3-4. Thus, he suggested that these exhibits were also not submitted to or considered by the issuing magistrate judge when he issued Search Warrant 182. See id. While the exhibits are indeed missing from the Court record, Defendant Evans, Sr. withdrew this argument in light of the recent Eleventh Circuit decision in United States v. Pratt, 438 F.3d 1264 (11th Cir. 2006). See Tr. at 183-84.

Although he withdrew the argument that the absence of these exhibits invalidates the warrant, Defendant did not comment on whether the Court should now consider copies of those exhibits when determining whether the affidavit included sufficient facts for the issuing judge to determine that there was probable cause to issue Search Warrant 182. Therefore, the Court must address this issue.

Preliminarily, the Court notes that regardless of the fact that Exhibits A and B to the application for Search Warrant 182 are missing from the court files, Search Warrant 182 itself does include Exhibits A and B. See Search Warrant 182 (Dkt. No. 206). In Groh v. Ramirez, 540 U.S. 551, 557 (2004), the United States Supreme Court stated that "[t]he Fourth Amendment by its terms requires particularity in the warrant, not in the supporting documents." As the warrant in question did include Exhibits A and B, the Court finds that it may rely on them to determine whether the issuing judge had probable cause to issue Search Warrant 182.

As for Exhibit 1, it may also be relied upon by the Court in determining probable cause. Indeed, the Eleventh Circuit Court of Appeals has previously held that "other evidence" may be used to prove the contents of the affidavit presented for Search Warrant 182. See United States v. Lambert, 887 F.2d 1568 (11th Cir. 1989). In Lambert, the Eleventh Circuit upheld the district court's determination that an affidavit was presented to the issuing magistrate judge despite the complete absence of the affidavit from the court record. See 887 F.2d at 1572. In that case, the district court held an evidentiary hearing and found the officer executed the application and supporting affidavit under oath before a magistrate judge, that these documents were returned to the clerk's office, and that the affidavit was subsequently lost. See id. In addition, to prove the contents of that supporting affidavit, the Eleventh Circuit upheld the district court's reliance on a duplicate. See id.

Currently, the "other evidence" in the instant case to prove that Exhibit 1 was included is: 1) Judge Snyder's statement that his usual practice in issuing a search warrant is to check all references to exhibits for the corresponding documents, see Order (Dkt. No. 263) at 2 n.1; and 2) Agent Hall's affidavit executed under oath that Agent Wescott's affidavit was attached as Exhibit 1, see Aff. for Warrant 182 ¶ 3. Additionally, the "other evidence" available to prove the content of Agent Wescott's affidavit is a copy of it in the record from Search Warrant 119, see Aff. for Warrant 119 (Dkt. No. 199). Thus, the Court finds there is sufficient evidence to permit reliance on a copy of the affidavit attached as Exhibit 1 in determining whether there was a substantial basis for the magistrate judge to issue Search Warrant 182.

Defendant Evans, Sr. also alleged previously that the affidavit in support of Search Warrant 182 included several "material misrepresentations and omissions of material facts that

(continued...)

the First Motion to Suppress at 12.  Subsumed in this argument is the Evans' contention that Search Warrant 182 was based on stale evidence because many of the facts related to matters that were investigated thirteen to fourteen months prior to the issuance of Search Warrant 182.  See id. at 8-9.  However, the government contends that although much of the information was historical, it was not stale because the misconduct is ongoing and the information was updated.  See Opposition to the First Motion to Suppress at 12-13.  The government further asserts that a review of the affidavit clearly supports a finding of probable cause, see id. at 13, or alternatively, that even if the application for Search Warrant 182 lacked probable cause, the Leon good faith exception to the exclusionary rule would require this Court to deny the motion to suppress.  See id. at 17.

Search Warrant 182 was predicated upon the assertion that there was probable cause to believe that evidence concerning a violation of 18 U.S.C. §§ 241 (conspiracy to violate the Thirteenth Amendment), 894 (collection of credit through extortionate means), 1001 (false statements), 1581 (peonage), 1584 (involuntary servitude), 1589 (forced labor), 21 U.S.C. §§ 841 (the manufacture or distribution of a controlled substance), 844 (simple possession of a controlled substance), and 29 U.S.C. §§ 1812, 1841, 1851 (criminal violations of the MSAWPA having to do with vehicles authorized to transport laborers) would be found at the Residence.  See App. for Warrant 182.  A review of the affidavit reveals that there was a substantial basis for the issuing judge to find probable cause to believe that evidence of such

---

[33](...continued)
the Government should be called upon to explain at an evidentiary hearing."  Memorandum in Support of the First Motion to Suppress at 8-9.  However, at the hearing, he withdrew this argument, see Tr. at 179-180, and therefore, the Court will not consider it.

crimes could be found at the Residence.  Indeed, it contains allegations that laborers of the Evans Labor Camp would buy cigarettes, beer, and/or crack cocaine from the Evans' on credit and that laborers indebted to the Evans' for these purchases were not allowed to leave.  See Aff. for 182, Exh. 1 ¶¶  13, 20, 23, 27, 30, 39, 48, 50, 52, 53, 55, 57, 62, 64; Aff. for 182 ¶¶ 7-9, 33, 40, 42, 43.  Further, the affidavit alleged that these purchases were recorded in a notebook and that there were other documents reflecting laborer work contracts, liability waivers, payroll, and other employment related information located in the office.  See Aff. for Warrant 182 ¶¶ 7, 9, 13-14, 17, 19, 40, 42, 45, 48.  Finally, as for the MSAWPA, the affidavits included information that the vehicles used to pick up the laborers were not authorized to transport workers and were overloaded.  See Aff. for Warrant 182, Exh. 1 ¶¶ 66, 74, 90.

As specific support that evidence of the offenses could be found at the Residence, the affiant stated that on May 7, 2004, Defendant Evans, Sr. retrieved business records from his Residence, see id. ¶ 17, that Defendant Evans, Sr. stated that all records of the Evans Labor Camp were maintained at the Residence, see id. ¶ 19, that on May 5, 2005, Defendant Evans, Sr. confirmed that the Residence address was still his business address, see id. ¶ 30, and that on June 3, 2005, during the execution of Search Warrant 178, the agents observed labor camp documents, business records, including payroll records, payroll ledgers and employment contracts, as well as coded documents, guns, a safe, and bulk quantities of cigarettes at the Residence, see id. ¶ 48.  Based upon a review of the allegations in the affidavit, the undersigned concludes that it contained sufficient allegations

for the issuing judge to determine that there was probable cause to believe that evidence of the listed violations of federal law would be found at the Residence.

The undersigned must also determine whether this information was sufficient to established probable cause to believe that evidence of a crime would be found at the Residence at the time Search Warrant 182 was issued. See United States v. Bervaldi, 226 F.3d 1256, 1264 (11th Cir. 2000) (stating that "the information supporting the government's application for a warrant must show that probable cause exists at the time the warrant issues"). "When reviewing staleness challenges we do not apply some talismanic rule which establishes arbitrary time limitations for presenting information to a magistrate, rather, we review each case based on the unique facts presented." United States v. Harris, 20 F.3d 445, 450 (11th Cir. 1994). Indeed "even stale information is not fatal if the government affidavit updates, substantiates, or corroborates the stale material." Id. Factors courts consider when determining staleness include: length of time, "nature of the suspected crime (discrete crimes or ongoing conspiracy), habits of the accused, character of the items sought, and nature and function of the premises to be searched." Id. As for the nature of the crime, if the "alleged criminal activity is ongoing . . ., it is unlikely that the passage of time will dissipate probable cause." United States v. Hooshmand, 931 F.2d 725, 735 (11th Cir. 1991). Moreover, the Eleventh Circuit Court of Appeals has recognized that "if an affidavit

recites activity indicating protracted or continuous conduct, time is of less significance.  See United States v. Bascaro, 742 F.2d 1335, 1345-46 (11th Cir. 1984).[34]

In the instant case, the affidavit in support of Search Warrant 182 provides evidence of protracted and ongoing criminal activity that was updated with information received the day prior to the day the agent sought Search Warrant 182.  Indeed, the allegations in Agent Wescott's affidavit suggest that the Evans' and the Evans Labor Camp had been distributing crack cocaine on credit to the laborers since at least 1994.  See id., Exhibit 1 ¶¶ 52, 55, 56.  Further, according to Agent Hall's affidavit, this activity continued into 2004 and 2005.  See id. ¶¶ 6-7, 24, 33, 39, 42-43.  In addition, Agent Hall further updated and verified that this criminal activity was ongoing by incorporating witness interviews obtained during the execution of Search Warrant 177 on the day prior to seeking Search Warrant 182.  See id. ¶¶ 31-49.  Not only did these new facts verify that the alleged criminal activity was ongoing but also that the office for the Evans Labor Camp was still located at the Residence.  See id. ¶ 48.  Thus, although much of the evidence was taken from Agent Wescott's 2004 affidavit, the evidence was of protracted and ongoing criminal activity that was corroborated and updated by the information obtained on the day prior to Agent Hall's application for Search Warrant 182.  Accordingly, the Court finds that sufficient evidence was provided to the issuing judge to support a conclusion that there was probable cause to believe that evidence of a crime would be found at the Residence at the time he issued Search Warrant 182.  Thus, the undersigned will recommend that the First Motion to Suppress be denied.

---

[34]     That court also specifically noted that "protracted and continuous activity is inherent in large scale drug trafficking operations" and that in such cases, the staleness issue should be construed liberally.  Id. at 1346.

**C.    Third Motion to Suppress - Search Warrant 199 (Computer Search)**

The Evans' also contend that the affidavit in support of Search Warrant 199 did not "support a finding that there was probable cause to believe that evidence of any specified crime would be found in [the] computer." Memorandum in Support of the Third Motion to Suppress at 3.[35] However, the government disagrees and again argues that even if probable cause was lacking, the evidence should not be suppressed based on the application of the <u>Leon</u> good faith exception to the exclusionary rule. <u>See</u> Opposition to the Third Motion to Suppress at 6.

Upon review of the affidavit, the Court finds that it included sufficient facts for the issuing judge to determine there was probable cause to believe that evidence of a crime could be found in the computer. Initially, it is important to note that the facts relied upon in the affidavit were developed during the search of the Residence pursuant to Search Warrant 182, which this Court previously determined was lawfully issued, <u>see</u> <u>supra</u> Part IV(B). In addition to other things, Search Warrant 182 authorized the seizure of: 1) documents reflecting entries of debts and interest charged to laborers; 2) documents relating to laborer and employee earnings and payroll; 3) personnel documents; and 4) records relating to laborer injuries. <u>See</u> Search Warrant 182, Attach. B. The affiant attached and incorporated the affidavit made in support of Search Warrant 182 to the affidavit in support of Search Warrant 199. <u>See</u> Aff. for Warrant 199 ¶ 3.

---

[35]    The Evans' also argued that the computer itself had been unlawfully seized from the residence. <u>See</u> <u>id.</u> at 2-3. However, in reliance on the government's proffered evidence concerning the seizure of the computer, the Evans' withdrew this argument. <u>See</u> Tr. at 194-95. Accordingly, the Court will not consider this argument.

In the affidavit submitted in support of Search Warrant 199, the affiant stated that during the search of the Residence pursuant to Search Warrant 182 many of the seized documents were found in a "home office area" in the garage. See Aff. for Warrant 199 ¶ 5. This area contained a desk, a computer desk, a personal computer, and a printer. See id. The affiant asserted that documents found close to the computer appeared to have been generated from the computer because, "[f]or instance, some of the documents had proportional fonts of differing sizes." See id. ¶ 6. These documents included payroll ledgers and worker lists and specifically related to the operations and employees of the Evans Labor Camp. See id. Further, near the computer the affiant observed "computer data compact discs, one computer digital video storage disc, and computer diskettes." Id. ¶ 7. Based on his "observations of the computer, its location, the nature of the documents, their location, the digital storage media and their location," the affiant stated his belief that the computer "and the digital storage media [were] used to create, edit, and store documents pertaining to the operation of the Evans Labor Camp in East Palatka, Florida." Id. at ¶ 8. Accordingly, the affiant concluded that there was probable cause to believe that evidence of illegal activity including a violation of the Thirteenth Amendment, collection of credit by extortionate means, false statements, peonage, involuntary servitude, forced labor, distribution and possession of controlled substances and violations of the MSAWPA would be found in the computer and the related digital media found at the Residence.

Based on the facts set forth in the combined affidavits, the undersigned concludes that the issuing judge was presented with sufficient information to support a finding that, more than likely than not, evidence of the offenses listed in the application would be found

in the computer.  Many of the listed offenses related to the Evans Labor Camps' employment practices.  The facts alleged in the Application for Search Warrant 199 established that agents had already located documents relating to the employment practices of the Evans Labor Camp which appeared to be generated by a computer.  These documents included documents that the agents were authorized to seize as evidence of crimes pursuant to Search Warrant 182 and which appeared to have been generated by a computer.  Additionally, these documents were found next to the computer with an attached printer.  Given this information, the judge could reasonably conclude that additional evidence of one or more of the enumerated crimes would be found on the computer.  As this is the only challenge Defendants assert in the Third Motion to Suppress, the Court will recommend that this motion be denied.

> ### D.    Fifth Motion to Suppress - Search Warrant 178

The Evans' contend that the application and affidavit in support of Search Warrant 178 failed to provide sufficient facts to support a finding that there was probable cause to believe that evidence of a CWA violation existed or that evidence of such a crime would be found at the Residence.  See Fifth Motion to Suppress at 2-3.  They assert that the "only allegation of probable cause . . . is found at paragraph number 30 . . . .," id. at 1, which merely contained unsupported speculations and conclusions, see id. at 2.  In response, the government contends that there was probable cause to support the warrant and that, even if probable cause was lacking,  the Leon good faith exception would apply.  See Opposition to the Fifth Motion to Suppress at 6.

Upon review of Search Warrant 178 and its supporting affidavit, the Court finds that the following alleged facts created a sufficient substantial basis for the issuing magistrate judge to find that there was probable cause to believe that evidence of a crime would be found at the Residence. In the affidavit, Agent Mowatt asserts that he observed a white PVC pipe protruding from the Florida Camp property which seemed to run from the buildings located on the property. See Aff. for Warrant 178 at ¶ 22. The pipe was discharging what appeared to be waste water directly into the creek. See id. Indeed, Agent Mowatt recognized submerged and floating human waste in the creek and a strong odor of raw human waste in the area. See id. Agent Mowatt searched the state and federal permit databases and did not discover a permit allowing Defendant Evans, Sr. or the Evans Labor Camp to discharge pollutant into any water of the United States. See id. ¶ 19. Agent Mowatt stated that Putnam County records revealed that the Evans' Labor Camp was not connected to nor a customer of the Putnam County Water and Sewer Authority, id. ¶ 20, and also noted that he located a permit for a 1200-gallon septic tank that was manufactured and installed at the Florida Camp by "R.Evans." Id. ¶ 21. The permit also indicated that an additional 1650-gallon system was planned to be installed. See id. Based upon his personal observation of the pipe and its discharge of waste water, Agent Mowatt concluded that the septic system at the Evans Labor Camp was being bypassed, thereby causing human waste to flow from the camp around the septic system and directly into Cow Creek. Id. at ¶ 30.

Based upon his training and experience, Agent Mowatt further informed the magistrate judge of his expectation that records associated with the construction of any such illegal bypass would be maintained by the Evans Labor Camp. Id. at ¶¶ 28 - 30. Thus,

Agent Mowatt sought permission to search the Residence, as the administrative office of the Evans Labor Camp, for records pertaining to the discharge of wastewater.  See id. at ¶¶ 23, 26, 27.  As specific support for the assertion that evidence of a CWA violation would be found at the Residence, by virtue of the fact that the Residence is also the office for the Evans Labor Camp, Agent Mowatt explained, based on his training and experience, that businesses such as the Evans Labor Camp would keep records of compliance with state and federal agency regulations.  See id. ¶ 28.  He further averred that "[b]ased on [his] training and experience, [he] kn[e]w that a business such the Evans Labor Camp would generate paper specifically relating to the installation and maintenance of a septic system or waste disposal system."  Id. ¶ 29.  In addition, he stated that if the construction of a bypass of the septic system was done by outside contractors, he would expect records concerning that work to be maintained by the Evans Labor Camp.  See id. ¶ 30.

As noted supra, the issuing magistrate judge's determination of probable cause is entitled to great deference, see United States v. Clay, 355 F.3d 1281, 1284 (11th Cir. 2004) and the court's review is limited to whether the issuing judge had a substantial basis to conclude that probable cause existed, see Angulo-Hurtado, 165 F.Supp.2d at 1375-76 (citations omitted).  Moreover, probable cause does not require "overwhelmingly convincing evidence" rather only "reasonably trustworthy information."  Id. at 1376 (quoting Ortega v. Christian, 85 F.3d 1521, 1524 (11th Cir.)).  Based on the facts submitted to the magistrate judge, it appears reasonable to conclude that the PVC pipe was discharging a pollutant into the creek behind the Florida Camp and, as discussed above, that the creek behind the Florida Camp was "waters of the United States."  Further, it was reasonable to conclude that

Defendant Evans, Sr. knew of the discharge.  Thus, the issuing judge had probable cause to believe that the Evans' were violating the CWA.  Further, the facts demonstrate that information regarding the installation of the pipe, which was apparently the cause of the discharge, would likely be found at the Evans Labor Camp office.  Finally, the facts in the affidavit also establish a reasonable basis to conclude that the Evans Labor Camp office is located at the Residence.

The Evans' argue that only paragraph 30 contains an allegation supporting probable cause to believe that evidence of a crime would be found at the Residence and that paragraph 30 is speculative, conclusory, and does not support a probable cause finding. See Memorandum in Support of the Fifth Motion to Suppress at 1-2.  However, as shown above, there are other allegations that support a finding that evidence of a crime would be found at the Residence.  See Aff. for Warrant 178 ¶¶ 28-30.  Moreover, although the Evans' contend that paragraph 30 should be disregarded because it was based on the affiant's training and experience, see Memorandum in Support of the Fifth Motion to Suppress at 2, the Eleventh Circuit has held that an agent's reliance on training and experience is not improper, see Jenkins, 901 F.2d at 1079, 1081.

In Jenkins, the court found that an allegation that "people who steal money are most likely to take it to their homes for safekeeping" in combination with probable cause that the defendant committed a theft of items that could be hidden in a residence, and the agent had ten years of experience investigating such thefts provided the issuing judge with sufficient facts to justify a search of the defendant's residence.  See id.  Similarly, in the present case, there was probable cause to believe that Defendant Evans, Sr. was committing a criminal

violation of the CWA, that the administrative office for the Evans Labor Camp was located at the Residence and that records related to this offense could be stored in that office.  The affiant also relied on his twelve years of experience with EPA criminal investigations to support his belief that records related to the Camp and any sewer system construction would be kept in that office.  Accordingly, the issuing judge's reliance on the affiant's training and experience that the Evans' would keep septic system documents in the office was not in error.  Therefore, the undersigned finds that the issuing judge was justified in finding probable cause that evidence of a crime would be found at the residence and will recommend that the Fifth Motion to Suppress be denied.

## V.    <u>Leon</u>[36] Good Faith

Because the undersigned has concluded that each of the five search warrants challenged by Defendants were properly issued, the Court need not decide whether the good faith exception to the exclusionary rule would permit introduction of any evidence seized pursuant to those warrants.  However, in an abundance of caution and to avoid any further delay of this action should the district judge determine that the undersigned has erred in any of the above conclusions, the Court will address the <u>Leon</u> good faith arguments submitted by the parties.

If there was no probable cause to issue a warrant, then the Fourth Amendment has been violated.  While, the text of the Fourth Amendment provides no remedy for violations, the courts, in interpreting this amendment, have created a remedy.  <u>See</u> <u>Leon</u>, 468 U.S. 906.  That remedy, the exclusionary rule, is "'designed to safeguard Fourth Amendment rights

---

[36]    <u>United States v. Leon</u>, 468 U.S. 897 (1984).

generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved.'" (quoting United States v. Calandra, 414 U.S. 338, 348 (1974)); see also Arizona v. Evans, 514 U.S. 1, 10 (1995).  Accordingly, the rule provides for the exclusion of evidence obtained in violation of the Fourth Amendment in a criminal proceeding against the victim of the illegal search.  See Calandra, 414 U.S. at 347.

Notwithstanding the recognition of the exclusionary rule, a court is not required to suppress evidence every time it finds that a warrant was issued in violation of the Fourth Amendment.  See Leon, 468 U.S. at 908.  The United States Supreme Court, in United States v. Leon, recognized a good faith exception to the exclusionary rule.  See 468 U.S. at 913, 924.  "As set forth in Leon, the good-faith rule allows the introduction of evidence obtained in the reasonable good-faith belief that a search or seizure was in accord with the Fourth Amendment."  United States v. Glinton, 154 F.3d 1245, 1257 n. 11 (11th Cir. 1998) (internal quotation marks omitted).  In doing so, the Court held that the application of the exclusionary rule should be reserved for those instances "'where its remedial objectives are thought most efficaciously served.'"  468 U.S. at 908 (quoting Calandra, 414 U.S. at 348). In addition, it found that "the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates."  Id. at 916; see also Illinois v. Krull, 480 U.S. 340, 347 (1987) (recognizing that "the prime purpose of the exclusionary rule is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures" (internal quotation marks omitted)).  Thus, "[p]enalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations."  Leon, 468

U.S. at 921.  Therefore, the Court has instructed that the exclusionary rule should not be employed when the constitutional violation is the result of a judicial error.  See Massachusetts v. Sheppard, 468 U.S. 981, 990 (1984); see also Evans, 514 U.S. at 11, 14-15 (concluding that an exception to the exclusionary rule exists when the constitutional error is attributable to court employees and indicating that "[w]here the exclusionary rule does not result in appreciable deterrence, then, clearly, its use . . . is unwarranted" (internal quotation marks omitted)); Martin, 297 F.3d at 1320 (opining that "[u]nless the issuing judge wholly abandons his role . . . , then the officer need not pay for the judge's mistake and the Leon good faith exception should apply").  The Court explained that the exclusion of evidence in these instances would not have a significant deterrent effect because the judges do not have a stake in the outcome of the case and "there exists no evidence suggesting that judges and magistrates are inclined to ignore or subvert the Fourth Amendment or that lawlessness among these actors requires application of the extreme sanction of exclusion."  Leon, 468 U.S. at 916-17.

The Supreme Court in Leon also concluded that a law enforcement officer cannot be expected to second-guess the judge's decision that there is probable cause or that the warrant is technically sufficient.  See id.  It opined, "'[O]nce the warrant issues, there is literally nothing more the policeman can do in seeking to comply with the law.'"  Id.  The operative inquiry in determining whether an officer acted in an objectively reasonable manner is: "whether a reasonably well trained officer would have known that the search [or seizure] was illegal despite the [judge's] authorization."  Id. at 922 n.23; see also Martin, 297 F.3d at 1318.  The court must consider the totality of the circumstances in making this determination.

See Leon, 468 U.S. at 922 n.23; see also Martin, 297 F.3d at 1309 (finding that the court may look outside the four corners of the affidavit in determining whether the officer acted in objective good faith).

On the other hand, the Supreme Court also acknowledged the following four instances in which the good faith exception should not be applied and instructed the evidence should be excluded where: (1) the judge "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his [or her] reckless disregard of the truth"; (2) the judge "wholly abandoned his [or her] judicial role"; (3) the "warrant [was] based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) the "warrant [was] so facially deficient – i.e., in failing to particularize the place to be searched or the things to be seized – that the executing officers [could] not reasonably presume it to be valid." Leon, 468 U.S. at 923 (internal quotation marks omitted); see also United States v. Robinson, 336 F.3d 1293, 1296 (11th Cir. 2003); Martin, 297 F.3d at 1313.  The government "bears the burden of demonstrating the applicability of the Leon good faith exception."   United States v. Robinson, 336 F.3d at 1297.

The Court will first consider the application of Leon to the EPA Searches, Search Warrants 177, 178, and 203.  The government contends that even if the Rapanos decision requires a finding that the facts set forth in the affidavits were insufficient to establish CWA jurisdiction, the motions to suppress should nevertheless be denied because the agents relied in good faith on facially valid search warrants issued by the magistrate judge.  See Government's Rapanos Memorandum at 2.  With regard to Search Warrants 177, 178, and

203, however, Defendants assert that the Leon good faith doctrine is unavailable to the government. See Second Rapanos Memorandum at 5. The argument they assert in support of this conclusion is not one of the four exceptions to the doctrine recognized by the Court in Leon. Rather, Defendants suggest that the Court should not consider the government's Leon argument because even Leon cannot cure reliance on warrants that were void ab initio. See id. at 1-5.

Preliminary, the Court notes that Defendants have not directed the Court to any legal authority which supports the proposition that the failure of an application in support of a search warrant to contain sufficient facts to support a conclusion that an offense within the jurisdiction of the Court has been committed renders such a warrant void from its inception or otherwise fatally flawed. Indeed, none of the cases cited by Defendants supports such a conclusion.

The first case relied upon by Defendants is United States v. Brouillette, 478 F.2d 1171 (5th Cir. 1973). While it is true that the court in Brouillette found a search warrant invalid because the supporting affidavit provided no information to establish a violation of a federal statue, the court did not consider whether evidence seized based upon that warrant was, nonetheless, properly admitted at the trial based upon an exception to the exclusionary rule. See id. at 1175-78. The court failed to consider this possibility for the obvious reason that the Brouillette decision was handed down in 1973, some eleven years before the Supreme Court recognized a good faith exception to the exclusionary rule in Leon. See Leon, 468 U.S. at 897. Similarly, Defendants' reliance on United States v. Rubio, 727 F.2d 786 (9th Cir. 1983) and Kellen v. State, 273 So.2d. 235 (Ala.Crim.App. 1972) is of little value as those

cases also were decided prior to the Court's recognition of the Leon good faith doctrine and therefore did not consider it.  See Rubio, 727 F.2d at 795; Kellen, 273 So.2d at 239. Accordingly, the Brouillette, Rubio, and Kellen decisions do little to support Defendants' position.

Moreover, the Court notes that nothing in the Brouillette, Rubio and Kellen decisions suggests that these courts considered the warrants to have been "void" because they failed to include sufficient facts to suggest that a federal offense had been committed.  Instead, the courts simply considered the absence of facts supporting the existence of a federal offense as they would the absence of any other allegation necessary for a finding of probable cause. Thus, rather than support Defendants' contention, these cases may well support a conclusion that the failure to include facts sufficient to properly invoke the Court's jurisdiction should be treated no differently than the failure to include other facts necessary to a finding that there is probable cause to believe that evidence of a crime is present at a particular place at a given time.  Certainly, the Leon good faith exception has been applied routinely in such circumstances.  See generally United States v. Taxacher, 902 F.2d 867, 870-72 (11th Cir. 1990); United States v. Martin, 297 F.3d 1308, 1312-15 (11th Cir. 2002).

Next, Defendants point the Court to Armstrong v. Melvindale, 432 F.3d 695, 700 (6th Cir. 2006) arguing that in that case the Sixth Circuit held a search warrant invalid because "no probable cause existed to believe the documents themselves evidenced a crime."  See Second Rapanos Memorandum at 2.  However, the Armstrong decision does nothing to aid the Court's analysis of whether Leon good faith should be considered in this case.  In Armstrong, the court simply determined whether the defendant officers were entitled to claim

qualified immunity for their apparent Fourth Amendment violation.  See Armstrong, 432 F.3d at 698-99.  The failure of the Armstrong court to discuss Leon in such a civil action is irrelevant to the question before this Court.

Defendants also cite State v. Perrone, 834 P.2d 611 (Wash. 1992) in support of their position.  Unlike the other cases cited by Defendants, Perrone was decided after the Supreme Court recognized the Leon good faith doctrine.  However, the Perrone court specifically stated that it would not address the Leon good faith doctrine in its decision, because the matter was not raised by the parties.  See 834 P.2d at 621 n.5.  Accordingly, like Armstrong, the Perrone decision does little to aid the Court in its analysis.

In an effort to distinguish the case before the Court from those to which Leon traditionally applies, Defendants argue that the warrants in the instant case are really more akin to a warrant that "is determined to be void ab initio because of a defect in its issuance." Second Rapanos Memorandum at 4.  Thus, they contend that the Leon good faith exception cannot be applied to permit introduction of the government's evidence.  See id.  In support of this proposition, Defendants cite United States v. Parker, 373 F.3d 770 (6th Cir. 2004) and United States v. Scott, 260 F.3d 512 (6th Cir. 2001).  However, neither of those cases involved a finding by the court that the search warrants were not supported by probable cause, nor did they involve a finding by the court that the search warrants failed to provide sufficient facts upon which the court could reasonably conclude that federal jurisdiction was properly invoked.  Instead, both Parker and Scott dealt with warrants that were issued by an individual who had no authority to issue warrants.  See Parker, 373 F.3d at 774; Scott, 260 F.3d at 515.  As a result, the Sixth Circuit concluded in each case that the warrants were

void from their inception, and further concluded that the Leon exception to the exclusionary rule would not apply.  See Parker, 373 F.3d at 774; Scott, 260 F.3d at 515.

Unlike the facts presented in Parker and Scott, the search warrants in this instant case were all issued by the Honorable Howard T. Snyder who, as a United States Magistrate Judge sitting in the Middle District of Florida, was duly authorized to issue each of the warrants.  See Fed.R.Crim.P. 41.  Therefore, neither the Parker nor the Scott decision mandate a finding that the warrants at issue would be void ab initio.  Moreover, a review of the Sixth Circuit's discussion in Scott further compels a finding that the warrants in the instant case, which were authorized by a magistrate judge, would not be considered void and, even if found to be lacking in probable cause, could nonetheless have been reasonably relied upon by the executing officer.  See Scott, 260 F.3d at 514-15.

In determining whether application of Leon would be appropriate based upon the facts before it, the Scott court noted that the core premise of the Leon decision is that the warrant had been issued by a magistrate or judge "clothed in the proper legal authority."  Scott, 260 F.2d at 514.  Thus, the question answered by the Court in Leon was whether "'evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause'" should be excluded.  Scott 260 F.3d at 515 (quoting Leon, 468 U.S. at 900 (emphasis added in Scott)).  As the Scott warrant was not issued by such a person, Leon was simply inapplicable. The court's discussion demonstrates that it was the fact that the Scott warrant had been issued by an individual who lacked legal authority to do so that compelled the court's conclusion that the warrant was void ab initio and not appropriate for an application

of Leon.  Scott, 260 F.3d at 515.  Nothing in that decision suggests that the court would reach the same conclusion when reviewing a search warrant issued by a magistrate judge, but nonetheless, later found to be unsupported by facts sufficient to properly invoke the court's jurisdiction.  Indeed, following the Scott decision, the Sixth Circuit applied Leon to permit evidence seized pursuant to a warrant that was invalid because it was issued by a county commissioner rather than a judge.  See United States v. Malveaux, 350 F.3d 555, 557-58 (6th Cir. 2003).  Despite the fact that the warrant was invalid, the court declined to find it void ab initio because it had been issued by an officer authorized to issue warrants under certain circumstances.  Id.

In the matter before the Court, each of the search warrant applications was submitted to a neutral and detached magistrate judge who, after his independent review, determined that each warrant application provided sufficient facts to support a conclusion that evidence of the offenses listed could be found in the places to be searched.  As noted by the Leon court, "'[O]nce the warrant issues, there is literally nothing more the [officer] can do in seeking to comply with the law.'"  Leon, 498 U.S. at 916-17.  Indeed, the Supreme Court has gone so far as to extend the holding in Leon even to situations in which an officer reasonably relies on a warrant that is based on a statute despite the fact that the statute is later determined to be unconstitutional.  See Krull, 480 U.S. at 349-60.  In Krull, the Court noted that the exclusion of evidence obtained based upon a statute that is only subsequently declared to be unconstitutional would not further the deterrent purpose of the exclusionary rule.  Id. at 350.

Defendants appear to attempt to distinguish <u>Krull</u> by arguing that <u>Leon</u> good faith has never been applied to allow the admission of evidence obtained based upon a warrant that describes "conduct that was never statutorily proscribed."  Second <u>Rapanos</u> Memorandum at 4.  The <u>Krull</u> decision, however, explains that in determining whether the exclusionary rule should be applied, the Court saw no reason to distinguish between a statute that defines a substantive criminal offense that is later found to be unconstitutional and a statue that authorizes warrantless administrative searches which are subsequently found to be unconstitutional.  <u>See</u> <u>Krull</u>, 480 U.S. at 355 n.12.  The Court concluded,

> [i]n either situation, application of the exclusionary rule will not deter a violation of the Fourth Amendment by police officers, because the officers are merely carrying out their responsibilities in implementing the statute.

<u>Id.</u>  Moreover, courts have also rejected exclusion of evidence as a remedy where a governmental agent involved in the criminal investigation exceeded his or her authority.  <u>See United States v. Mason</u>, 52 F.3d 1286, 1289 n.5 (4th Cir. 1995); <u>United States v. Jones</u>, 13 F.3d 100, 103 (4th Cir. 1993); <u>United States v. Walden</u>, 490 F.2d 372, 376-77 (4th Cir. 1974) (military investigation of civilian without jurisdiction did not warrant the extraordinary remedy of exclusion of evidence).  Based on the foregoing, the undersigned concludes that the exclusionary rule should not be applied to exclude evidence obtained by law enforcement officers who acted in objective, reasonable reliance on a statute (or an interpretation of that statute), despite the fact that the Supreme Court may have subsequently determined that the statute was unconstitutional or its interpretation was in error.

The undersigned therefore rejects the suggestion that <u>Leon</u> good faith is entirely inapplicable here, and must turn to the question of whether the executing officers

reasonably relied on the search warrants at issue.[37]  As this inquiry focuses on the executing officers' objective good faith belief at the time Search Warrants 177, 178, and 203 were issued and executed, see Leon, 468 U.S. at 920-23, the Court must look to the state of the law at that time to determine whether the officers could have objectively relied on the warrants of if they were "so lacking in indicia of probable cause as to render official belief in [their] existence entirely unreasonable." Id. at 923.  (citations omitted).  Indeed, in the Second Rapanos Memorandum, Defendants argue that the officers reliance on the search warrants at issue could not have been objectively reasonable in light of the Supreme Court's earlier decisions in SWANCC and Riverside.  See Second Rapanos Memorandum at 5.

Prior to the Rapanos decision, the Eleventh Circuit had the opportunity to interpret CWA jurisdiction in United States v. Eidson, 108 F.3d 1336 (11th Cir. 1997).  In Eidson, a pollutant was discharged into a sewer drain which flowed into an open drainage ditch.  See 108 F.3d at 1342.  The flow of that drainage ditch proceeded under a street and into a drainage canal which, in turn, emptied into a creek.  See id.  That creek was a tributary of Tampa Bay which is a "navigable water."  See id.  The Eidson court began its analysis by acknowledging that it was "well established that Congress intended to regulate the discharge of pollutants into all waters that may eventually lead to waters affecting interstate commerce." Id. at 1341.  It further unequivocally stated that "ditches and canals, as well as streams and creeks, can be 'waters of the United States'" and that whether the bodies of water are "man-made" makes no difference. Id. at 1342.  In addition, the court found "no

---

[37]     In the Second Rapanos Memorandum, unreasonable reliance on the search warrants is the only exception to the traditional Leon analysis asserted by Defendants.  See Second Rapanos Memorandum at 5.

reason to suspect that Congress intended to exclude . . . tributaries that flow only intermittently." Id. Thus, the court concluded that a pollutant discharged into a tributary of Tampa Bay and was therefore discharged into "waters of the United States." See id.

Although Eidson was decided prior to the Supreme Court's decision in SWANCC, it appears that it was still controlling authority in this Circuit, at least up until the Court's decision in Rapanos. Indeed, in Parker v. Scrap Metal Processors, Inc., decided several years after SWANCC, the court recognized disagreement amongst courts regarding "what bodies of water qualify as navigable waters under the CWA." 386 F.3d 993, 1004 n.11 (11th Cir. 2004). Nonetheless and without deciding whether it would adopt a broad or narrow interpretation of CWA jurisdiction, the court determined that the stream at issue was "unquestionably a navigable water." Id. In doing so, the court relied upon its prior decision in Eidson. See id. at 1009. Moreover, the court reaffirmed its holding that "[t]he term 'navigable' has little importance, and 'navigable waters' includes tributaries of waters that can be navigated." Id. (citing Eidson, 108 F.3d at 1342). It further confirmed that "'ditches and canals, as well as streams and creeks' are navigable waters if they are tributaries of a larger body of water." Id. (quoting Eidson). Thus, the court found a stream which was a tributary of the Yellow River to be a "water of the United States." See id.

Applying the Eidson/Parker interpretation of CWA jurisdiction to the instant case, the undersigned finds that not only could the executing officers have objectively and reasonably relied on the search warrants as establishing probable cause to search for CWA violations, the issuing judge also had sufficient facts to find that the water behind the Florida Camp fell under the CWA's jurisdiction. Indeed, the affidavits established that pollutant was being

discharged from a point source into the creek seen running behind the Florida Camp.  <u>See</u> Aff. for Warrant 177 ¶¶ 14-16, 22; Aff. for Warrant 178 ¶¶ 14-16; 22.  Furthermore, they stated that the creek was the headwaters or first section of Cow Creek which, in turn, flowed into the St. John's River.  <u>See id.</u>  Accordingly, there was sufficient facts for the issuing magistrate to find that the creek seen running behind the Florida Camp was a tributary of a navigable water and, therefore, that it fell under CWA jurisdiction.  Thus, the Court finds that the search warrants in question had sufficient "indica of probable cause" such that Agent Mowatt, and the other executing officers, could have reasonably relied on them.

The undersigned concludes that Agent Mowatt and the other executing officers, should not be punished for reliance on search warrants issued based on the state of the law at that time, one year prior to the Supreme Court's <u>Rapanos</u> decision.  <u>See</u> <u>United States v. Tuter</u>, 240 F.3d 1292, 1300 (10th Cir. 2001) (permitting introduction of evidence obtained pursuant to a deficient search warrant because the Supreme Court decision requiring corroboration of anonymous tips was decided after the warrant); <u>United States v. Brunette</u>, 256 F.3d 14, 19 (1st Cir. 2001) (applying <u>Leon</u> good faith to permit introduction of evidence obtained because the legal requirements for the issuance of such warrant were unclear at the time of its issuance); <u>United States v. Jasorka</u>, 153 F.3d 58, 60-61 (2d Cir. 1998) (refusing to suppress evidence because the law was unclear at the time of the issuance of the warrant).  To find otherwise, would mean that operation of the exclusionary rule would not serve its remedial purpose.  Moreover, as noted in <u>Leon</u> excluding the evidence in this context could "in no way affect [the officer's] future conduct unless it is to make him less willing to do his duty." <u>Leon</u> 468 U.S. at 920.  In light of the foregoing, the undersigned will

recommend that, even if the Court determines that the <u>Rapanos</u> decision mandates a finding that Search Warrants 177, 178, and 203 were not supported by probable cause because they failed to include sufficient facts to establish CWA jurisdiction, the evidence obtained pursuant to Search Warrants 177, 178, and 203 should nonetheless be considered admissible in accordance with <u>Leon</u>.

With regard to Search Warrants 182 and 199, the government has also proposed that if the Court were to conclude that these warrants were not supported by probable cause, the <u>Leon</u> good faith doctrine should preclude exclusion of any evidence seized pursuant to such warrants.  <u>See</u> Opposition to First Motion to Suppress at 17; Opposition to Third Motion to Suppress at 6.  Defendants have not presented any argument to suggest that <u>Leon</u> good faith would not be applicable to those warrants, nor have Defendants suggested that any of the exceptions to the <u>Leon</u> good faith doctrine are applicable.  The undersigned has previously concluded that the warrants were supported by probable cause and issued by a duly authorized magistrate judge.  The warrants specifically identified the places to be searched and items to be seized.  Accordingly, upon its own independent review, the Court finds that the <u>Leon</u> good faith doctrine would be applicable if the Court were to determine that the warrants were improperly issued.  The undersigned further finds that none of the exceptions to the good faith doctrine recognized by the Supreme Court are present.  Thus, the undersigned will recommend that should the district judge determine that Search Warrants 182 and 199 were improperly issued, the Court should apply the <u>Leon</u> good faith doctrine and permit introduction of any evidence seized pursuant to those warrants.

## VI.    CONCLUSION

In light of the foregoing, the undersigned recommends that all of the motions to suppress be denied.

## RECOMMENDATION

Accordingly, it is recommended that:

1.      Ronald Robert Evans, Sr.'s Motion to Suppress Evidence Derived from Constitutionally Invalid Search Warrant Identified as the Warrant Filed Under Case No. 3:05-m-182 (Second Search of Residence) (Dkt. No. 249) be **DENIED**;

2.      Ronald Robert Evans, Sr.'s Motion to Suppress Evidence Derived from Constitutionally Invalid Search Warrant Identified as the Warrant Filed Under Case No. 3:05-m-177 (First EPA Florida Labor Camp Search) (Dkt. No. 251) be **DENIED**;

3.      Ronald Robert Evans, Sr.'s Motion to Suppress Evidence Derived from Constitutionally Invalid Search Warrant Identified as the Warrant Filed Under Case No. 3:05-m-199 (Computer Search) (Dkt. No. 258) be **DENIED**;

4.      Ronald Robert Evans, Sr.'s Motion to Suppress Evidence Derived from Constitutionally Invalid Search Warrant Identified as the Warrant Filed Under Case No. 3:05-m-203 (Second EPA Florida Labor Camp Search) (Dkt. No. 259) be **DENIED**; and

5.      Ronald Robert Evans, Sr.'s Motion to Suppress Evidence Derived from Constitutionally Invalid Search Warrant Identified as the Warrant Filed Under Case No. 3:05-m-0178 (First Search of Residence) and Incorporated Memorandum of Law in Support (Dkt. No. 331) be **DENIED**.

**ENTERED** at Jacksonville, Florida, this 14th day of July, 2006

**MARCIA MORALES HOWARD**
United States Magistrate Judge

lc2

Copies to:

The Honorable Timothy J. Corrigan
United States District Judge

Counsel of Record